[Civ. No. 1744.  Third Appellate District.—November 14, 1917.]

MARY FOLEY et al., Respondents, v. PAUL HORNUNG, Appellant.

NEGLIGENCE — INJURY TO CUSTOMER OF MERCHANT — FALL THROUGH ELEVATOR HOLE—STATUS OF CUSTOMER.—A merchant who directs a customer to the rear of his store for the purpose of looking at an article offered for sale is liable in damages for personal injuries sustained by the customer in stepping into and falling through an elevator hole in the floor, without fault or negligence on the part of the customer, since such customer was not a mere licensee, and it being the duty of the merchant to use all reasonable means to make that part of the store safe for one visiting it.

ID.—VERDICT—QUOTIENT METHOD—VERDICT NOT BY "CHANCE."—A verdict is not one arrived at by chance within the meaning of section 657 of the Code of Civil Procedure, where the jurors disagreeing as to the amount, agreed to divide the sum of the various amounts which each juror believed to be proper by the number of the jurors, without agreeing to be bound by the result, and after considering the quotient adopted it as the verdict.

APPEAL from a judgment of the Superior Court of Kern County, and from an order denying a new trial.   M. L. Short, Judge.

The facts are stated in the opinion of the court.

Kaye & Siemon, for Appellant.

Thomas Scott, and Rowen Irwin, for Respondents.

CHIPMAN, P. J.—Plaintiffs are husband and wife, and the action is by plaintiff, Mary Foley, for injuries received by her through the alleged negligence of the defendant.   It appears from the complaint that the defendant is a merchant conducting business in the city of Bakersfield in a building situated on Chester Avenue.   It is alleged that the place of defendant's business consisted of a building, on the ground floor of which his general merchandise business was conducted, and to which access was had at the entrance on Chester Avenue.   That there was a basement to the building about nine feet below the ground floor.   That toward the rear of said ground floor there was a large hole or opening in which was an elevator used for the purpose of conveying goods to and from the basement to the ground floor, and was "so located that anyone entering said store for the purpose of making a purchase therein would be liable to fall into said hole or opening unless the same was properly provided with guards or the said opening was closed," and that the said hole was dangerous to persons trading in or walking in or about said store.   That on June 3, 1912, the plaintiff, Mary Foley, entered said defendant's store for the purpose of purchasing a tent and was met by defendant, "who directed her to the rear end of said store to look at some tents which defendants were offering for sale."   That while plaintiff was passing to the rear of said store for the purpose mentioned, and having no knowledge that there was an opening or trap in said floor, she stepped into and fell through said hole to the basement, thus receiving the injury complained of; that the said opening was by reason of the negligence of defendant wholly unprotected or closed.

The complaint then set forth the nature of the injuries received, alleging that they "were not caused by reason of the negligence of the said plaintiff, Mary Foley."

A general demurrer to the complaint was overruled and defendant answered, denying specifically the averments of the complaint except as to the general description of the building and the location of the opening mentioned in the complaint. Alleged "that the hole mentioned and described in said complaint was carefully guarded by a rope firmly suspended a distance of two and a half feet above the floor of the storeroom, and about four feet distant from the edge of the opening mentioned in the said complaint, in a manner so that the same was plainly visible to the sight of any person proceeding toward the said opening, and that the same formed an effectual obstruction against a person attempting to proceed toward said hole or opening; and the said plaintiff entirely disregarded the said guard or rope and deliberately walked under or over the same, and, through her own carelessness and negligence, caused herself to be precipitated into the basement of the said building." That defendant's store mentioned in the complaint was divided into two departments, "the fore part of which was arranged for the reception of customers of said defendant and of displaying and dispensing merchandise to them, and the rear portion of the said store at said time was used by the said defendant for a workshop, in the manufacture and repair of harness and other leather goods, and also for storing merchandise of the said defendant in a loft suspended over said shop." That the said opening mentioned in the complaint "was situated in the rear of said store and in that portion thereof so used by the said defendant as a workshop." That on said date defendant proceeded to the rear portion of the store for the purpose of procuring a tent to show to plaintiff "in the front portion of the said store, and before departing to procure the said tent enjoined the said plaintiff to remain in the front portion of the said storeroom until the said defendant should return with the said tent," and that plaintiff disregarded the instructions of the defendant and "deliberately walked over or under the said rope and was proceeding toward that portion of the said storeroom used as a workshop by said defendant, when she precipitated herself into the said opening, and sustained the injuries alleged in

her complaint.'' Alleged that at the said time the said store-room and that portion where the said opening was situated was well lighted ''and the said rope and opening were plainly visible to any person proceeding toward the same, and had the said plaintiff exercised ordinary care and caution, she would have avoided falling into the said opening and sustaining the injury alleged in her complaint.''

The cause was tried by the court with a jury and plaintiffs had the verdict for damages in the sum of two thousand dollars, on which judgment was accordingly entered. Defendant appeals from the judgment and from the order denying his motion for a new trial. A reversal of the judgment and the order is asked on the grounds: (1) The insufficiency of the evidence to justify the verdict; (2) Errors of the court in admission of testimony and comment. of the court upon such testimony; (3) The error of the court in refusing and giving instructions; (4) Misconduct of the jury in reaching their verdict by resort to chance.

The account of the accident appears by the testimony of plaintiff, Mary Foley, found in the record in narrative form. We quote as follows:

''On the 3d of June, 1912, I lived in Bealeville, Kern County. I came to Bakersfield the 3d of June to get a tent. I asked a gentleman where I could get a tent, and he says, 'Go over there, that store there; they have tents there.' I went over there and he was standing at the door where I could see him before I went in, and the gentleman came out and says, 'What do you want?' I says: 'Do you sell tents here?' and he says, 'Yes, come in,' and I went right in. I went right after him, and I went in part way, and he went that. way [pointing], and I went this way. I followed him up and he went that way [pointing], and I went in the hole. I couldn't say how far I was behind him when following him. Both of us was walking; he was walking and I was walking after him. The distance between us maybe two or three steps. I couldn't say. He walked in and I walked right after him. He went that way and I followed him. He turned that way, where the buggies were, the right hand. I couldn't tell you anything about what part of the store it was that he turned, only he turned that way, and the hole was right here, and the counter was right here, and when he

went that way where the buggies was— The Court: What part of the store were you in when he turned? A. Just even with the counter, and he turned and it happened so quick— it happened so quick that I couldn't do any more. The hole was in the middle of the floor, quite a ways back in the building, near the counter. It was back near the end of the counter. It's quite a long store. I was about three or four feet from the counter when this man turned to the right. After he turned to the right I fell in the hole right there. The counter was on the left side of the building coming in. I couldn't tell where I fell, but it was a hole. That was all I know about it. It was a big dark place I fell in. I fell down and went to the bottom, wherever it was, about ten or twelve feet, as far as I know. . . . There was no rope or guard or railing of any kind around this opening that I could see when I fell into it, and after I fell in it. There was nothing there to stop me from falling in there. I just stepped in there and went down. There was nothing there. I didn't see anything there. I had never been in the store before. I did not know there was an opening in the floor there. Nobody told me there was a hole there or said anything to me of any kind, to look out or be careful, or anything about it. I did not see any hole there. When I was brought up immediately after the fall and was sitting in the chair on the floor near the opening there was no rope there or guard around this hole to prevent me from falling into it. . . . A person coming along by the side of the counter, by the front counter toward the rear part of the store, would walk into the hole all right. The counter ended maybe two, maybe a couple of feet from the hole. . . . It was about half-past 8, or maybe quarter past 8 in the morning when I was hurt. Q. What was the condition of the light there, if you know, as to the place being light or dark? A. Well, it was so dark when I got back there, as far as that place— it was pretty dark when I got back there where I fell.''

On her cross-examination, she testified: ''I think I met Mr. Hornung. I thought it was the man that was running the place. I was looking in the door to see what I could see, to see if I could see what I wanted, and he came up and says, 'Is there anything you want?' and I says, 'Yes, I want a tent.' I met Mr. Hornung at the door; I am sure I met him

at the door. I think it was Mr. Hornung; it was the front door of the store on Chester Avenue. . . . I did not talk to him in the front of the store any time, only just that much. I went right in after talking to him. He says, 'Come right in.' I did not stop between the time I left the front door and the time I fell in the hole. I seen a counter in the store as I went along. He went in the store and I went in after him, and the counter was on the left side as you enter. . . . The man that met me turned to the right and I didn't turn at all. I followed him and he went to the right and I went into the hole. I didn't go to the left; I couldn't. I guess he knew the hole was there and he knew how to cross it. I don't know how close the buggies were to the hole. They were on the right side; I didn't pay much attention to them. . . . I didn't see any passage on the left side of the hole. I didn't see any before I fell on either side. I didn't know the hole was there at all. It wasn't dark altogether; it was sort of dark; it wasn't any way lightsome. I think there was some light in the back part of the store, a door or something. I couldn't tell you, to my best of belief there was. I walked in and he walked in before me. I walked in after him and he went that way [pointing] and I was into the hole then. He turned to the right and I went straight into the hole. It did not take half a second, I didn't take only one step, I guess.''

Plaintiff David Foley testified that shortly after the injury he visited the store of defendant, and was asked to state what he observed in regard to the location of the said opening. He testified: ''Of course, when I went there, the hole was closed. I wanted them to open the hole so I could look down— Mr. Irwin: No, no; never mind that. Where was it? A. It was right at the end of the counter. You go right down along the counter, and it was right at the end of the counter. I should judge the edge of the hole was two or three feet from the end of the counter. It may be changed since. The size of the hole, when it took two men to lift the cover, it must be a pretty good size, maybe two or three or four feet.''

The defendant Hornung testified to the circumstances attending the accident and submitted the following diagram which, he testified, illustrates the situation of the store

interior and the arrangement on the ground floor of the building:

The evidence was that a counter extended from a point near the entrance on Chester Avenue on the left hand in entering the store and continued back near the point where the diagram locates the rope. Defendant testified that he met the plaintiff at the door, where the conversation took place substantially as testified to by plaintiff, and that defendant proceeded back toward the rear of the store, plaintiff following him to a point marked on the diagram as "P," near the showcase. He testified: "I first had a conversation with her right there. I observed her coming into the store; she was alone when I first had a conversation with her; I was back of the counter and she was standing in front of the counter in the aisle. She wanted to know if I had tents. I asked her the question, I think, five or six times. I couldn't understand her, and walked around the showcase and stood close to her, and says, 'What is it you want?' and she says, 'I want a tent. You have got tents?' I says, 'Yes, ma'am.' I says, 'What size tent do you want?' She says, 'A pretty good size, 10x12 or 12x14.' I says, 'Stay right here, and I will get you one.' She was where this letter 'P' is on the plat. I then left the lady and walked back past the desk. I went through underneath, raised up the rope, went through the rope, walked around on the left side of the elevator and started up the stairway, about halfway up, to get a tent for the lady. I did not go clear up into the gallery. Mr. Flack, a gentleman, happened to be there at the time, and he says: 'The lady fell in the elevator.' I then came downstairs, went down the stairway, and went right down in the basement. She was lying down in the southeast corner of the elevator, near the front. We picked the lady up and put her on a box, brought her upstairs, slid her through under the rope and let her sit down on a chair outside of the office,

a regular office chair. . . . This occurred, I should judge, about from a quarter after 8 to half-past 8 in the morning, and at that time the sun was striking the front part of the building. The lights were burning in the basement, because you can't work in the basement unless you have lights, and Mr. Mays was working there."

Defendant's statement of the facts was corroborated by the testimony of several witnesses, including employees of the defendant who were in the storeroom at the time. They stated in their testimony that they heard the defendant say to the plaintiff, "Stay right where you are," referring to the direction given by the defendant to plaintiff, and some of these witnesess, particularly employees of the defendant, testified that a rope was stretched across the room at the time substantially as shown on the diagram.

Conceding the rule where the evidence is conflicting, defendant urges that it would be unfair and unreasonable to apply the rule here in view of the fact, as is contended, that the implied findings of the jury must have rested alone upon the testimony of one witness, herself pecuniarily interested, whereas four or five witnesses corroborated portions of defendant's testimony—particularly as to whether the rope was in place when Mrs. Foley started to follow plaintiff, and whether or not he had told her to "stay right where you are" when he went back to get a tent. Three of these corroborating witnesses were working in and about the store. Two others were present who happened to be present and were apparently disinterested. Not all of these witnesses testified that the rope was in place, nor did all of them hear defendant say to plaintiff, "Stay right where you are and I will go out and get you a tent," or give similar directions. The jury were instructed in the language of the Code of Civil Procedure, section 2061, subdivision 2, as to the number of witnesses.

The conduct of Mrs. Foley on the occasion involved was not such as to suggest negligence on her part. It was the most natural thing for her to follow defendant, when told to do so, to the point where the tents were, thus avoiding the necessity of bringing forward for inspection a bulky and rather heavy article. She may not have heard defendant tell her to wait at the point "P" on the diagram; she testified she did not. Her testimony was that she followed close to

defendant, passing along next to the counter, at the end of which was the elevator opening. She testified that defendant swerved to the right at this point and she took a step or two straight forward and went down into the hole. Defendant testified that he lifted up the rope and passed under. It was negligence on his part if the rope was in place to pass under it and give plaintiff no caution to avoid the elevator hole. He testified that he did not know whether she went under or over the rope. It seems to us he ought to have known her danger and should have cautioned her to avoid it. If the rope was stretched across the store as shown on the diagram, plaintiff could not have stepped over it or passed under it without stopping and noticing what was beyond. The more reasonable inference from the facts and circumstances as narrated by her is that she did precisely what she was invited to do, and in the doing of which she, without fault or negligence on her part, fell into this hole in the floor.

We do not think it can reasonably be said, as is now urged, that plaintiff was a mere licensee in entering the back part of the store, "and as such licensee was bound to accept the premises in the condition in which she found them, and therefore took upon herself the peril and risk of approaching the elevator shaft." The jury accepted as true the testimony of plaintiff that she was invited by defendant to go to this part of the store, and it was clearly the defendant's duty to use all reasonable means to make that part of the store safe for one visiting it.

At the close of defendant's evidence, plaintiff Mary Foley was recalled in rebuttal. The following took place: "Mr. Scott: Q. Mrs. Foley, I will ask you to state whether at any time, on the 3d of June, last year, when you were in Mr. Hornung's store, that he told you to stay there, used the words to you, to 'Stay there,' that he would bring you, or show you the tent. Mr. Kaye: We object to that on the ground that it is leading, and on the ground that the conversation between the plaintiff and the defendant Hornung had been fully narrated by the plaintiff on her direct examination, in making out her case, and it is not rebuttal. The Court: The objection will be overruled. A. He didn't. He said, 'Come right along.' Mr. Scott: Q. Now, I will ask you to state whether or not on that morning, the 3d of June,

1912, you went under any rope stretched across the room, or over any rope? Mr. Kaye: We object to this on the ground that the same is not rebuttal; that the witness is sought by counsel to testify to matters that were fully answered by her in making out her case. The Court: I think she did testify to that upon the direct, but then I will overrule the objection. This is a matter that is probably of some importance. A. No, sir. Mr. Scott: Q. Did you come in contact with any rope at all, when you were going toward the rear end of the store that morning? A. No, sir."

It is urged that the court erred in making the remark: "This is a matter that is probably of some importance."

The objection that the question had been answered in making out the case in chief and hence was not proper rebuttal should have been sustained for the reason stated. The ruling can hardly be treated as seriously prejudicial. The answers were but repetitions of previous answers. It is, however, urged that the remark of the judge "constituted such grave error that the verdict should be set aside." We do not think that the remarks of the judge could have resulted in the jury's having attached additional significance to the answers by reason of such remarks. It seems to us if counsel had at the time regarded the remarks as prejudicial, they should, in fairness to the judge, have called attention thereto and asked to have the remarks stricken out. We doubt not the court would have granted such a motion.

The court gave the following instruction: "That while in determining the preponderance of evidence you are not to take into consideration the number of witnesses produced by each party which testify to a particular fact, and while the evidence on an issue of fact is not necessarily balanced because the witnesses who testify on one side are directly contradicted by the same or a less number on the other side, yet in such a situation you are not authorized to arbitrarily disregard the testimony of any witness without some reason therefor, and other circumstances are to be considered, as in cases where the number of witnesses on each side is unequal. The intelligence, fairness, and means of observation and various other recognized factors in determining the weight of evidence should be taken into consideration, and also the reasonableness, truthfulness, disinterestedness, and credibility thereof."

It is objected that the following part of the instruction is error: "That while in determining the preponderance of evidence you are not to take into consideration the number of witnesses produced by each party which testify to a particular fact." It is stated in the brief that "in giving this instruction the court modified instruction No. 6 requested by the defendant, and in so doing violated the well-established rule relating to disparity in the number of witnesses." Literally read, the first part of the instruction would seem to be amenable to the objection, for circumstances may exist under which the number of witnesses testifying to a particular fact or set of facts might determine where the preponderance of the evidence lay. Further along in the instruction, the court said that where there was a contradiction in the testimony, the jury "are not authorized to arbitrarily disregard the testimony of any witness without some reason therefor, and other circumstances are to be considered, as in cases where the number of witnesses on each side is unequal." The court then added that "the intelligence, fairness, and means of observation and various other recognized factors" should be taken into consideration.

The court instructed the jury as indicated in another part of this opinion "that you are not bound to decide in conformity with the declarations of any number of witnesses, which do not produce conviction in your minds, against a less number or against a presumption or other evidence satisfying your minds." The court also instructed the jury "that preponderance of evidence simply means the greater weight of evidence, or evidence which is more credible and convincing to the mind, or evidence of such character and weight as carries conviction to the mind of the juror of the existence of facts sought to be proved." It was immediately following this instruction that the court gave the instruction now complained of. We do not think that the court could have had in its mind or that it meant to convey to the jury an impression that they could not take into consideration the number of witnesses produced by a party, but that the thought in his mind and the thought which was conveyed was that the number of witnesses would not necessarily be the determining factor.

In support of the ground for a new trial under misconduct of the jury, the defendant filed the affidavits of certain of the

jurors. Plaintiff filed counter-affidavits of certain other jurors. The jurors who made affidavits at the request of the defendant stated as follows: ''That when the jury were deliberating upon the verdict to be rendered in the said action, they were unable to agree upon the amount that should be awarded to the plaintiff as damages, whereupon it was agreed that each juryman should place the amount for which he believed the verdict should be rendered upon a slip of paper, and the same should be cast as a secret ballot, and the sum of the various amounts so voted by the twelve jurymen should be divided by 12, and they should be governed by the quotient obtained by such division; that this quotient was the sum of $2,104 or thereabouts; that when it was found that the quotient was not a round sum, it was suggested that it would be better, under the previous agreement to insert an even sum, to wit, the sum of two thousand dollars, as their verdict, instead of such quotient; whereupon, said suggestion was, without further consideration or discussion of the case, adopted, and the verdict was so rendered; that all of the jurors agreed to said proposition and to accept and abide by the result so obtained as the verdict in said action, and at least four of the said jurors did not believe the said quotient or the said sum of two thousand dollars to be a proper sum to be awarded the plaintiff, but did think that the said sum was too large, and they assented to said verdict solely by reason of the said agreement.''

The jurors who made affidavits in support of the verdict deposed that when they commenced to deliberate upon the verdict they found they were unable to agree as to the amount which plaintiff was entitled to recover, ''but that each and every juror believed that plaintiff was entitled to recover some amount from said defendant.'' That in order to determine the amount, the jurors agreed among themselves that each one would write on a piece of paper secretly the amount which plaintiff was entitled to recover, and that they then would put all the several amounts together and divide the sum by 12, ''which they did, but they did not agree to be bound by the result. After each juror had placed on a slip of paper the amount which he believed that the plaintiff was entitled to recover, the twelve amounts were added together and divided by 12 and the result or quotient was in excess of two thousand one hundred dollars; that after such

result was obtained and made known, the jury then further considered the amount which plaintiff should recover, and each juror then and there agreed, after consultation among themselves, that they would not adopt the quotient or result so obtained, but after such consideration and discussion among themselves, they did agree among themselves that the plaintiff be awarded as damages the sum of two thousand dollars, and that thereupon the said jury unanimously returned a verdict in favor of the plaintiff for the said sum of two thousand dollars.''

The contention of defendant is that the verdict was arrived at by chance, and is forbidden by the provisions of section 657 of the Code of Civil Procedure, and that the misconduct of the jury calls for a new trial.

It will be noted that there is a very sharp conflict between the two sets of affidavits. The affidavit in support of the motion shows that the jury had not only agreed to the method by which the amount should be reached, but agreed to be governed by the quotient obtained by such a division. It also stated, after ascertaining the quotient, that they changed the amount to an even sum, and that they acted upon this suggestion and adopted said even sum of two thousand dollars without further consideration or discussion of the case. The other affidavits show that the jury, in order to determine the amount which the plaintiff should receive, agreed to write on a slip of paper, each one secretly, the amount, and these several amounts could be added together and divided by 12, but the affiants stated that the jurors did not agree to be bound by this result, and that after the result shown by such division was made known, they entered upon further deliberation of a verdict and finally reached a different conclusion from that shown by the division.

The question here then is, in view of the conflict, whether the order may be supported by the most favorable view of the facts presented to the court by the affidavits. The affidavits submitted in opposition to the motion for a new trial, when reduced to their essential and material elements, show that the jury agreed to the plan described for the purpose of ascertaining what an average amount would be when thus ascertained, but that there was no agreement to adopt this amount or to be governed by it, and that after having obtained this amount, they deliberated upon their verdict and

finally reached the definite sum of two thousand dollars, in which no element of chance can be said to have necessarily entered.

It is not unusual, nor is it objectionable, for each juryman to mark on a ballot the amount he thinks should be allowed, if any, and these ballots may subsequently be read by the jurymen. They thus get some idea of each other's views which may aid in reaching a concurrence of judgment. The misconduct of the jury for which a new trial may be granted arises "whenever any one or more of the jurors have been induced to assent to any general or special verdict, or to a finding on any question submitted to them by the court, by resort to the determination of chance," and the statute provides that "such misconduct may be proved by the affidavit of any one of the jurors." (Code Civ. Proc., sec. 657, subd. 2.)

It has been held that an average verdict arrived at by dividing the sum of the various amounts which each juror believed proper, by the number of the jurors, under a prior agreement that such average verdict should be the verdict of the jury without further consultation, is a chance verdict and should be set aside. (*Dixon* v. *Pluns,* 98 Cal. 384, [35 Am. St. Rep. 180, 20 L. R. A. 698, 33 Pac. 268] ; *Weinburg* v. *Somps,* 4 Cal. Unrep. 10, [33 Pac. 341].) But the verdict is not a chance verdict where the jurors agreed to divide the aggregate amount by 12, and where it was understood that they were not to be bound by the result, and after the amount was so ascertained, the jurors unanimously agreed to adopt it as the sum to be returned. (*Hunt* v. *Elliott,* 77 Cal. 588, [20 Pac. 132] ; *McDonnell* v *Pescadero & San Mateo Stage Co.,* 120 Cal. 476, [52 Pac. 725] ; *Dixon* v. *Pluns, supra.*)

We must assume that the trial court accepted the statements in the counter-affidavits as true, and upon that assumption we think the verdict cannot be said to have been assented to "by resort to the determination of chance."

The judgment and the order are affirmed.

Burnett, J., and Hart, J., concurred.