[Civ. No. 3044.  Second Appellate District, Division Two.—February 14, 1920.]

## MARGARET A. B. HAM et al., Appellants, v. COUNTY OF LOS ANGELES et al., Respondents.

[1] APPEAL—ORDER SUSTAINING DEMURRER.—An order sustaining a demurrer is not an appealable order.

[2] NEW TRIAL—ORDER GRANTING—GROUNDS—APPEAL.—On an appeal from an order granting a new trial, where the particular grounds upon which the order was made do not appear in the record, the ruling of the trial court must be sustained if any one of the grounds presented on the motion is well taken.

[3] ID.—DISCRETION—APPEAL.—The discretion of the trial court in granting a new trial is very broad, and the order will be upheld unless it appears that the discretion has been abused.

[4] TRIALS—ERRONEOUS CHANCE VERDICT.—There is no impropriety in the jurors making an average of their individual estimates as to the amount of damages for the purpose of arriving at a basis for discussion and consideration, nor in adopting such average if it is subsequently agreed to by the jurors; but to agree beforehand to adopt such average and abide by the agreement, without further discussion or deliberation, is fatal to the verdict.

[5] NEW TRIALS—CONFLICTING AFFIDAVITS—PROVINCE OF TRIAL COURT—APPEAL.—Where, on a motion for a new trial based upon the misconduct of the jury, there is presented to the trial judge affidavits by the jurors outlining the procedure they adopted in arriving at the verdict rendered and counter-affidavits by the jurors, subsequently made, containing additional or conflicting statements, a question of fact for the trial court to determine is presented, and its finding cannot be disturbed by the appellate court.

[6] HIGHWAYS—LOCAL TRAFFIC REGULATIONS—CONFLICT WITH STATE LAWS.—Local regulations may be adopted controlling street and highway traffic which are not in conflict with the state Motor Vehicle Act, and such regulations are not in conflict which merely place additional and more stringent limitations upon the operation of motor vehicles than those prescribed by the state law.

[7] ID.—RATE OF SPEED OVER BRIDGES—VALIDITY OF LOCAL ORDINANCE. A county ordinance which declares it unlawful to drive any vehicle

4.  Chance verdict, note, 11 L. R. A. 706.

6.  Municipal regulations as to use of streets by automobiles, note, Ann. Cas. 1916E, 1050.

7.  Regulation of speed of automobiles, notes, 3 Ann. Cas. 495; 7 Ann. Cas. 551; 8 Ann. Cas. 437; 11 Ann. Cas. 728; Ann. Cas. 1916E, 1067; 1 L. R. A. (N. S.) 219; L. R. A. 1918D, 132.

over or across any county bridge at a rate of speed greater than five miles an hour is not in conflict with the provision of subdivision (b) of section 22 of the Motor Vehicle Act, which declares that a motor vehicle shall not be operated over bridges at a rate of speed greater than ten miles an hour where the view of the road traffic is obstructed.

[8] Id.—Violation of Local Ordinance—Negligence Per Se.—The violation by the plaintiff of a provision of a county ordinance regulating speed of travel across bridges constitutes an act of contributory negligence if it proximately contributes to the accident.

[9] Id.—Darkness as an Obstruction—Violation of Motor Vehicle Act.—An automobile driver who attempts to cross a bridge in a state of darkness, even with the aid of artificial lights, is operating in violation of the provision of subdivision (b) of section 22 of the Motor Vehicle Act, which declares that a motor vehicle shall not be operated or driven at a greater rate of speed "than one mile in six minutes when the operator's or chauffeur's view of the road traffic is obstructed . . . in approaching or traversing a bridge," if he travels at a rate of speed exceeding that named in the statute.

[10] Id.—Driving at Night — Ability to Stop Within Distance Lighted—Erroneous Instruction.—An instruction laying down a general rule of law that it is in all cases negligence *per se* to drive an automobile at night at a rate of speed which will not permit of stopping within the distance lighted by the lamps of the machine is erroneous, in that it does not take into account the degree of darkness of the night or known conditions of the road.

[11] Id.—Action for Damages Under Pridham Act—Use of Due Care—Burden of Proof.—Under the Pridham Act, a person suing to recover damages for an injury received due to a defective condition of a county highway must affirmatively show that the road was, at the time of the accident, being used with due care, that is, without negligence approximately contributing to the injury.

[12] Id.—Presumption of Use of Due Care—Erroneous Instruction.—In such an action, an instruction that "the law provides, however, that it is presumed that all persons use due care for the preservation of their own life and to avoid injury to themselves; in the absence of any evidence in the case with relation to the question of the care used by the deceased at the time of the injury in question, your finding on this issue on this presumption

10. *Res ipsa loquitur*, as applied to automobile accident, notes, 5 A. L. R. 1240; 12 A. L. R. 668; 32 L. R. A. (N. S.) 1177.

Speed of automobile as negligence, notes, 25 L. R. A. (N. S.) 40; 38 L. R. A. (N. S.) 488; 51 L. R. A. (N. S.) 993.

must be in favor of the plaintiffs," relieves the plaintiff from any showing whatever as to the due care in the use of the highway and is, therefore, erroneous.

[13] ID.—MINISTERIAL DUTIES — NEGLIGENCE — LIABILITY OF PUBLIC OFFICERS.—Public officers are liable for their negligence where the duty imposed upon them is ministerial in character and not judicial or discretionary.

[14] ID.—DELEGATION OF DUTIES TO ROAD COMMISSIONER—EXEMPTION OF SUPERVISORS FROM LIABILITY.—When the supervisors of the county have, by appropriate general rules, regulations, and directions, provided for the maintenance and ' repair of the highways by a road commissioner, in the absence of specific knowledge of his failure to perform his duty in some particular case, they are relieved from responsibility for the results of his negligence.

[15] ID.—REPAIRS REQUIRING SPECIAL ACTION BY SUPERVISORS—LIABILITY OF COMMISSIONER FOR DELAY.—Where the repairs required to be made on a county highway bridge are so extensive that they can not be made by the road commissioner without special action first taken by the board of supervisors, such commissioner is absolved from liability for delay in repairing the bridge.

[16] ID.—DISCRETION OF SUPERVISORS—LIABILITY FOR DELAY.—Where the repairs required are such that it is a matter of discretion with the supervisors, not only as to the method of repair which they might adopt, but as to when the repairs shall be made, or whether made at all, that discretionary power absolves them from liability for delay in making the repairs.

[17] ID.—DUTY OF SUPERVISORS TO PLACE SAFE-GUARDS OR WARNINGS. The provision of the Pridham Act that public officials shall not be liable for any injury arising from dangerous or defective condition of a highway which it is their duty to care for or repair, unless they shall have had actual notice of such defective or dangerous condition, "and shall have failed for a reasonable time after such actual notice to repair the same," is not to be construed to mean that such a place of danger may, with immunity, be left unguarded and without barriers or warnings until it can conveniently be repaired.

APPEAL from an order of the Superior Court of Los Angeles County granting a motion for a new trial. Affirmed.

The facts are stated in the opinion of the court.

Mattison B. Jones and Jones & Evans for Appellants.

A. J. Hill, County Counsel, and Edward T. Bishop, Deputy County Counsel, for Respondents.

SLOANE, J.—The plaintiffs brought this action to recover damages for the death of one George Ira Ham, whose death was caused by his being driven off a bridge partly washed out by flood waters, while riding in an automobile with a companion, who was driving. The bridge was on one of the county roads and was part of the highway system of the county of Los Angeles.

The defendants were the county of Los Angeles, members of the board of supervisors of the county and their bondsmen, and F. H. Joyner, chief engineer of the county roads; Sydney A. Butler, John J. Hamilton, and Arthur King, and were charged with negligence in safeguarding and repairing the broken bridge.

Demurrers to the complaint, as not stating a cause of action against the defendants county of Los Angeles, Sydney A. Butler, John J. Hamilton, and Arthur King, were sustained without leave to amend. On the trial before a jury a verdict and judgment were rendered in favor of defendants Woodley, one of the supervisors, and Joyner, the road engineer. Verdict and judgment were for plaintiffs and against the remaining defendants, members of the board of supervisors and their bondsmen. The amount of recovery against these defendants was the sum of $18,330 and costs. On motion for a new trial the judgment for plaintiffs was set aside and a new trial granted. Plaintiffs have taken two separate appeals, one from the judgment or order sustaining the demurrers as to the defendants county of Los Angeles, Butler, Hamilton, and King; the other from the order of the trial court granting the motion for a new trial.

[1] The first appeal may be briefly disposed of. It does not appear that any judgment of nonsuit or dismissal was taken as to the defendants in whose behalf the demurrer was sustained. In any event, the appeal is not from any final judgment, but from the order sustaining the demurrer. As this is not an appealable order, the appeal must be dismissed. (*Rickert* v. *Zoeger,* 169 Cal. 399, [146 Pac. 894].) It may be stated, however, that appellants have abandoned their contention of error in sustaining the demurrers as to defendants Butler, Hamilton, and King; and only base their appeal as to the demurrer affecting the cause of action

against the county of Los Angeles, on the validity of that provision of the act of the legislature approved April 26, 1911 (Stats. 1911, p. 1115), attempting to make municipal corporations liable for negligence of their officers in the care or repair of highways, which provision, because not covered by the title of the act, was held unconstitutional in *Brunson* v. *City of Santa Monica,* 27 Cal. App. 89, [148 Pac. 950].

[2] The order granting a new trial, which is the basis of the second appeal, was made, generally, without specifying the particular grounds, upon a motion containing, among others, the following specifications: Newly discovered evidence; misconduct of counsel on the trial; errors in ruling on evidence; errors in instructions to jury; misconduct of the jury; insufficiency of the evidence, and errors in law occurring at the trial. Appellants, in attacking the order appealed from, are confronted with two limitations upon the action of this court in reviewing such an order: First, that where the particular grounds upon which the order was made do not appear in the record the ruling of the trial court must be sustained if any of the grounds presented on the motion is well taken (*Minturn* v. *Bliss,* 77 Cal. 90, [19 Pac. 185]; *Morgan* v. *Robinson Co.,* 157 Cal. 348, [107 Pac. 695]; *Hitchcock* v. *Rooney,* 171 Cal. 286, [152 Pac. 913]; *Miller* v. *Logan,* 32 Cal. App. 28, [161 Pac. 1022]), [3] and, second, that the discretion of the trial court in granting a new trial is very broad, and the order will be upheld unless it appears that the discretion has been abused (*Tweedale* v. *Barnett,* 172 Cal. 271, [156 Pac. 483]; *Harrison* v. *Sutter St. Ry. Co.,* 116 Cal. 156, [47 Pac. 1019]). In the case last cited, the supreme court lays down this broad rule: "That the granting of a new trial is a thing resting so largely in the discretion of the trial court that its action in that regard will not be disturbed except upon the disclosure of a manifest and unmistakable abuse, has become axiomatic. . . . So long as a case made presents an instance showing a reasonable or even fairly debatable justification under the law for the action taken, such action will not be here set aside, even if, as a question of first impression, we might feel inclined to take a different view from that of the court below." As we are satisfied that, under these general principles and the facts shown

in the record here, the order appealed from must be affirmed, it would only be necessary to consider a single well-grounded specification on the motion for a new trial. Since the case must go back for a new trial, however, and in compliance with request of counsel, we will give our best consideration to all the points raised on this appeal which are likely to arise on a retrial.

[4] *Misconduct of the Jury:* We are of the opinion that there was sufficient evidence before the trial court of misconduct of the jury in the manner of arriving at its verdict to justify granting a new trial. There were submitted by defendants on this point affidavits of most, if not all, of the jurors that, in determining the amount of damages, after nine of the jurors had agreed upon a verdict for plaintiffs, they agreed and proceeded as follows: "That each of said nine jurors would place upon a slip of paper the amount to which he believed the plaintiffs entitled; that said amounts should be added together, the resulting sum divided by nine, and the resulting quotient taken as the amount of the damages to be assessed against the defendants without further discussion, balloting or assent; that in pursuance of this agreement each of said nine jurymen placed upon a slip of paper the amount to which he believed the plaintiffs entitled, which nine amounts were thereupon added together, divided by nine, and the quotient resulting was $18,330; that thereupon, pursuant to said previous agreement, said sum of $18,330 was, without further discussion, balloting, or assent on the part of or by any of said nine jurors who joined in said verdict, entered by the foreman in the form of verdict prepared by the court, and no ballot was taken or assent given to said verdict other than that hereinabove set forth." Some of the affiants state that, although they deemed the quotient thus arrived at too large, they accepted it because of the agreement to abide by the result of the average.

If this state of facts existed, it is quite unnecessary to further analyze or discuss the matter. It was obviously a chance verdict, and not only justified, but made imperative a new trial. (*Dixon* v. *Pluns,* 98 Cal. 384, [35 Am. St. Rep. 180, 20 L. R. A. 698, 33 Pac. 268]; *McDonnell* v. *Pescadero Stage Co.,* 120 Cal. 476, [52 Pac. 725].) It is true, as held in the last cited case, that there is no im-

propriety in the jurors making an average of their individual estimates as to the amount of damages for the purpose of arriving at a basis for discussion and consideration, nor in adopting such average if it is subsequently 'agreed to by the jurors; but to agree beforehand to adopt such average and abide by the agreement, without further discussion or deliberation, is fatal to the verdict. [5] It is true, in the case before us, that plaintiffs presented to the court, on the motion, counter-affidavits of these same jurors, in which they modify their former statements, and allege that certain averments therein contained were inadvertently made; but these counter-affidavits contain no denial that there was a previous agreement to abide by the average sum arrived at, or that they were influenced in adopting such amount as their verdict by such an agreement. They do state, however, that there was deliberation and discussion after taking this average, before they finally voted to adopt it. But it is not the province of this court to determine whether the facts as related in the counter-affidavits are true; nor is it necessary to determine whether, if true, the amended affidavits avoid the attack on the verdict. If the trial judge had denied the motion for a new trial, we would be bound to presume that he accepted the amended counter-statements as sufficient, but, as he granted a new trial, we must assume the facts most strongly against appellants. The court may have believed that the jurors told the truth the first time. Indeed, it is rather difficult to accept the explanation that each of them inadvertently and unknowingly made oath to a statement, plainly set out in the affidavits, that he agreed to abide by the result of such an average of the amounts before the slips were filled out, and thereafter adopted such average as his verdict because of such agreement and without further discussion. At any rate, it was a question of fact for the trial court to determine where the truth lay, on this conflicting evidence, and we can no more disturb the finding against appellants than if the question arose on a finding in the trial of the facts of the case.

*Exclusion of County Ordinance:* Another ground of the motion for a new trial was the refusal of the court to admit in evidence an ordinance of the county of Los Angeles which declares it unlawful to drive any vehicle over or

across any county bridge at a rate of speed greater than five miles an hour. The board of supervisors of Los Angeles County, under the county charter (sec. 10, art. III), are vested with all the powers which are granted to supervisors under the constitution and general laws of the state. Under section 4041 of the Political Code, subdivisions 4, 31, 37, and 41, boards of supervisors are empowered to make and enforce rules and regulations for the protection, management, control, and use of public highways, and to enact ordinances for that purpose, and generally to make and enforce, within the limits of their county, all such local, police, sanitary, and other regulations as are not in conflict with general laws. In fact, the only objection raised as to the effect and validity of the ordinance in question was that it is in conflict with the general laws of the state as embodied in the Motor Vehicle Act. The objection to the admission of the ordinance in evidence was based, and by the trial court sustained, on the authority of *Application of Smith*, 26 Cal. App. 116, [146 Pac. 82]. In so far as the decision cited suggests the operation of the State Motor Vehicle Act as superseding all municipal regulation of automobile traffic, whether conflicting with the state law or not, it is in conflict with a considerable array of subsequent decisions in the appellate courts, and particularly with the expression of the supreme court in the late case of *Mann* v. *Scott*, 180 Cal. 550, [182 Pac. 281]. [6] Indeed, it seems now to be the accepted law that local regulations may be adopted controlling street and highway traffic which are not in conflict with the State Motor Vehicle Act, and that such regulations are not in conflict which merely place additional and more stringent limitations upon the operation of motor vehicles than those prescribed by the state law. In *Mann* v. *Scott, supra,* the supreme court says: "Upon a careful reconsideration of the appellant's contention that the Motor Vehicle Act of 1913 is the controlling law upon the subject, and that it was error to give an instruction embodying the regulatory provisions of the city ordinance, we are constrained to confirm the opinion of the district court of appeal that the municipal ordinance in the respect noted is not inconsistent with the state law, but was valid and operative in the city of Los Angeles at the time of

plaintiff's injury; and this we think is so regardless of the question of whether or not the regulation of the traffic upon the streets of the city is a 'municipal affair.' . . . Where the legislature has assumed to regulate a given course of conduct by prohibitory enactments, a municipality with subordinate power to act in the matter may make such new and additional regulations in aid and furtherance of the purpose of the general law as · may seem fit and appropriate to the necessities of the particular locality, and which are not in themselves unreasonable.'' As further illustrating the point, the court, in this decision, quotes with approval the language of Mr. Justice Henshaw, in the case of *In re Hoffman,* 155 Cal. 114, 118, [132 Am. St. Rep. 75, 99 Pac. 517, 519] as follows: ''If the state should pass a law declaring it unlawful to erect a chimney of a height exceeding 150 feet, would anyone seriously contend that a city of the state within the earthquake zone might not by ordinance, in the clear exercise of police power for the benefit of its citizens, still further restrict · the height of chimneys?'' (*Mann* v. *Scott,* 28 Cal. App. Dec. 171; *Pemberton* v. *Arny,* 42 Cal. App. 19, [183 Pac. 356] ; *Ex parte Snowden,* 12 Cal. App. 521, [107 Pac. 724] ; *In re Hoffman, supra.*) [7] Under these authorities, the county ordinance here in question is clearly not in conflict with any provision of the State Motor Vehicle Act of 1913, then in force. The only provision of the state law relating specifically to regulation of speed in crossing bridges is contained in subdivision (b) of section 22 (Stats. 1913, p. 649), and declares that a motor vehicle shall not be operated or driven at a greater rate of speed ''than one mile in six minutes when the operator's or chauffeur's view of the road traffic is obstructed either upon approaching an intersecting way, or in traversing a crossing or intersection of ways, or in approaching or traversing a bridge, dam, trestle, causeway, or viaduct, or in going around corners or a curve in a street or highway.'' Under the natural and grammatical construction of this provision, it only relates to conditions where the view of the road traffic is obstructed, and we think the trial court was right in so construing it. But, at most, the provision is but a specification of a ten-mile-an-hour speed limit over bridges, and, under the decisions above cited, does not inhibit a local law prescribing a less rate of speed.

Moreover, the state law is obviously only intended as a speed limitation for the safety of traffic, while the county ordinance limiting the rate of speed to five miles an hour upon bridges, like the familiar enactments affixing a penalty for riding or driving over a bridge faster than a walk, may well be intended for the protection and preservation of the bridge itself against the well-known effect of excessive vibration. The issues on the trial involved the question of due care on the part of the deceased in the use of the highway. Evidence had been introduced showing that the automobile had slid or skidded forward a distance of from thirty to fifty feet, under locked brakes, before going over the broken end of the bridge, thus indicating an approach over the bridge at a considerable speed. Such a condition, in fact, might well indicate that if the ordinance had been observed the accident would have been averted.

[8] We are of the opinion that the county ordinance was valid, and that the violation of its terms was, under the established rules of law, an act of contributory negligence if it proximately contributed to the accident. (*Stein* v. *United Railroads,* 159 Cal. 368, [113 Pac. 663].) The exclusion of the ordinance from the evidence was error.

*Instructions as to Speed Limits:* Respondents, on their motion for a new trial, further complained of the action of the trial court in refusing instructions in their behalf bearing on the provisions of the state law limiting the speed on approaching or traversing a bridge, where the view of the traffic is obstructed, at a greater rate than one mile in six minutes. One of the instructions objected to contained language as follows: ''In that connection I charge you that darkness may constitute an obstruction within the law quite as much as intervening objects. If the driver of a motor vehicle enters upon a bridge at night, when it is impossible for him by means of the lights carried by his automobile to see across the bridge, then his view of traffic along the bridge is obstructed within the meaning of the law, and he is forbidden to proceed at a greater rate of speed than ten miles per hour.'' In a further instruction the court said: ''I instruct you that it is negligence, as a matter of law, to drive an automobile at night at such a rate of speed that the automobile cannot be stopped or an obstruction

or excavation avoided within the distance lighted by the lamps of the machine.''

[9] In view of our conclusion as to the validity and admissibility in evidence of the five-mile-per-hour limitation of the county ordinance, the doctrine invoked in these instructions does not need to be determined for the purposes of this case, but we are disposed to venture an opinion that the contention of respondents as expressed in the first quotation therefrom is well taken. Obviously, what the regulative provisions of the statute are intended for is to prevent an automobile driver from exceeding certain moderate speed limits where he cannot see what is ahead of him. The legislators were not indulging in any nice physical or metaphysical distinctions as to the nature of the obstructions to sight, whether they arose from positive or negative conditions; whether they were objective or subjective. It is just as dangerous to speed into a crossing or over a bridge without the use of one's sight to warn and guide him, whether the limitation is caused by defective vision, physical obstructions, the glare of an approaching headlight, a bank of mist or fog, or the absence of light—the condition we call darkness. Artificial light has been called into service to dispel the obstruction of the vision by the darkness of night, but it is only effective so far as its rays penetrate and illuminate. And it seems clear that the automobile driver who attempts to cross a bridge in a state of darkness, even with the aid of artificial lights, is operating in violation of this provision of the state law if he travels at a rate of speed exceeding that named in the statute.

[10] The second instruction quoted from is clearly erroneous, in laying down a general rule of law that it is in all cases negligence *per se* to drive an automobile at night at a rate of speed which will not permit of stopping within the distance lighted by the lamps of the machine. Such instruction does not take into account the degree of darkness of the night or known conditions of the road. But we are not prepared to say that negligence may not be predicated, as a matter of law, irrespective of any positive law as to speed limits, where an automobile is being driven in the night on any part of the highway, and where the driver is dependent upon the lights of his machine for knowledge of the condition of the road and the traffic upon it, and

runs into an obstruction, if he drives at a rate of speed which will not permit him to stop or slow up within the radius illuminated by his lights, and the accident is proximately caused thereby. This proposition is not without the support of eminent authority. In *Lawson* v. *Fond Du Lac*, 141 Wis. 57, [135 Am. St. Rep. 30, 25 L. R. A. (N. S.) 40, 123 N. W. 629], the driver of an automobile, traveling over a straight stretch of country road, ran into an unlighted and unprotected ditch or opening in the highway, and was injured. The evidence disclosed that he was traveling at a moderate rate of speed, but too fast to stop in time to prevent the accident after the broken condition of the highway was disclosed by his headlights. It was held by the supreme court of Wisconsin that it appeared as a matter of law that the driver was not using ordinary care in the use of the highway. The court says: "It seems to us, and we decide that the driver of an automobile circumstanced as was the driver of the car in which plaintiff was riding, and operating under such conditions as he operated his machine on the night of the accident, is not exercising ordinary care if he is driving the car at such a rate of speed that he cannot bring it to a standstill within the distance that he can plainly see objects or obstructions ahead of him. If his lights be such that he can see obstructions for only a distance of ten feet, then he should so regulate his speed as to be able to stop his machine within that distance." There are further arguments and conclusions in this case that are instructive on the principle invoked. Under similar conditions of darkness, where the automobile was run into an unlighted concrete mixer on the street, the supreme court of Tennessee, in *West Const. Co.* v. *White*, 130 Tenn. 520, [172 S. W. 301], held, as a matter of law, that "it was negligence for the driver of the automobile to propel it in a dark place, in which he had to rely on the light of his machine, at a rate faster than enabled him to stop or avoid any obstruction within the radius of his lights, or within the distance to which his lights would disclose the existence of obstructions." It was held to the same effect in *Knoxville Ry. & Light Co.* v. *Vangilder*, 132 Tenn. 478, [L. R. A. 1916A, 1111, 178 S. W. 1117], with the further declaration that the blinding glare of an approaching headlight only imposed a further duty on the driver to reduce

the rate of speed. (See, also, on this point, *Pietsch* v. *McCarthy*, 159 Wis. 251, [150 N. W. 482].)

[11] *Proof of Due Care:* Again, respondents claim, in support of the order for a new trial, that the jury was incorrectly instructed as to the nature and degree of evidence necessary to free the deceased from the imputation of contributory negligence. The statute under which it is sought to hold the highway officials of Los Angeles County liable for this accident is known as the "Pridham Act" (Act 2554, Stats. 1911, p. 1116. It is expressly provided by this act that "no liability for injury resulting from negligence in keeping a highway in repair shall rest upon such officials unless it shall appear that the damage or injury was sustained while such . . . highway . . . was being carefully used, and that due care was exercised to avoid such danger." This, as to this class of actions, clearly changes the rule generally applicable in the state of California, that the burden of showing contributory negligence is on the defendant. In the absence of the clause just quoted, the defendants, if they wished to show contributory negligence as a defense, would have to plead and prove it. But, as the statute reads, an affirmative showing that the road was, at the time of the accident, being used with due care, that is, without negligence proximately contributing to the injury, must be made by the plaintiffs in order to maintain their cause of action.

[12] On the trial, the court, after instructing the jury correctly as to the requirement that it must appear that the highway was being used with due care and without negligence, proceeded to cancel the effect of this requirement by the further instruction that "the law provides, however, that it is presumed that all persons use due care for the preservation of their own life and to avoid injury to themselves; in the absence of any evidence in the case with relation to the question of the care used by the deceased at the time of the injury in question, your findings on this issue on this presumption must be in favor of the plaintiffs. . . ." This instruction, as thus far quoted, seems to relieve the plaintiffs from any showing whatever as to due care in the use of the highway, and, we think, introduces an element of error into the instruction. (*Bell* v. *Incorporated Town of Clarion*, 113 Iowa, 126, [84 N. W. 962]; *Tyndale* v. *Old Colony R. Co.*, 156 Mass. 503, [31 N. E. 655]; *Bond* v.

*Smith,* 113 N. Y. 378, [21 N. E. 128] ; *Cordell* v. *New York, C. & H. etc. Co.,* 75 N. Y. 330 ; *Wiwirowski* v. *Lake Shore etc. Ry. Co.,* 124 N. Y. 420, [26 N. E. 1023].) The instruction then proceeds with a submission to the jury of rules of law to govern them in weighing evidence in the case, bearing upon this question, which, taken apart from the portion above quoted, probably correctly states the law, and permits the jury to take into account the recognized disposition of every rational person to avoid injury, but does not save it, as appellants justly contend, from the vice pointed out. From the recognized disposition of every rational person to avoid injury, the jury doubtless may infer, where the circumstances shown in evidence warrant it as a legitimate inference of fact, that the injured person did use due care; but to instruct the jury that the law raises a presumption of due care in such cases is to offset by a legal presumption the declaration of the statute that the burden is on the plaintiff in such cases to show that due care was used by him.

*Liability of Road Officials:* The most important question, in its application to a new trial of this case, is the construction of the Pridham Act, together with the rulings of the California courts, on the conditions under which public officers are liable for negligence in the care and repair of streets and highways. [13] The general rule in this state, if there may be said to be one established, is that public officers are liable for their negligence where the duty imposed upon them is ministerial in character and not judicial or discretionary. Such a rule of liability is first suggested, though not determined, in *Huffman* v. *San Joaquin County,* 21 Cal. 427, where Mr. Justice Field, in holding that no cause of action was created against the county by negligence of its officers in the performance of their duties, said, by way of *dictum,* that "if any remedy exists for injuries resulting from neglecting to keep such bridges in repair, it must be sought either against the road overseers or supervisors personally." Later decisions have laid down the general rule of liability, limiting it to negligence in the performance of ministerial duties, or, as the rule has been stated, that before a public official becomes liable for a breach of duty the duty must exist, and it must be such as not to involve the exercise of discretion on his part.

(*Doeg* v. *Cook,* 126 Cal. 213, [77 Am. St. Rep. 171, 58 Pac. 707]; *South* v. *San Benito County,* 40 Cal. App. 13, [180 Pac. 354]; *Dobbins* v. *City of Arcadia,* 44 Cal. App. 190, [186 Pac. 190].)

The main perplexity in the case of public officials, such as city trustees or the supervisors of a county, whose responsibilities include and blend almost indefinably the judicial, legislative, and administrative functions, is to determine where the ministerial and imperative duties end and the discretionary powers begin. It is said by some of the authorities that a public official is absolved from liability for negligence if the act is such as to involve ''any discretion on his part either as to its performance or the manner of its performance.'' This statement of the law obviously requires some modification, as it would be difficult to conceive of any official act, no matter how directly ministerial, that did not admit of some discretion in the manner of its performance, even if it involved only the driving of a nail. It would seem a fair application of the rule would be that any duty is ministerial which unqualifiedly requires the doing of a certain thing. To the extent that its performance is unqualifiedly required, it is not discretionary, even though the manner of its performance may be discretionary. *Words and Phrases* gleans from numerous authorities cited the following definition: ''A 'ministerial' act is one which a person performs in a given state of facts in a prescribed manner in obedience to the mandate of legal authority, without regard to or the exercise of his own judgment upon the propriety of the thing being done.'' (Vol. 3, 2d series.) In the matter of repair of streets and highways, there seems to be no longer a question, under the decisions of this state, that a street superintendent or road supervisor upon whom is imposed by statute or ordinance, or under the express direction of the legislative or administrative authority of the city or county, the duty of keeping in repair and making safe for public use the streets and highways, and to whom the means of carrying out this duty is available, is liable for a negligent performance of his duty; with the further proviso, under comparatively recent legislation, that he has had certain specified notice of the condition of the street or highway demanding attention. (*Wurzburger* v. *Nellis,* 165 Cal. 48, [130 Pac. 1052]; *Stockton Auto Co.* v. *Confer,*

154 Cal. 402, [97 Pac. 881] ; *South* v. *San Benito County,
supra; Dobbins* v. *City of Arcadia, supra; Doeg* v. *Cook,
supra.*)   In the case last cited it is indicated that there may
be a concurrent negligence which will involve a liability
both on the part of the supervisorial body—in that case the
city trustees—and the officer whose immediate duty it is to
make the repairs.  In *Lynn* v. *Adams,* 2 Ind. 143, the court
refused to hold the defendant, a supervisor of highways,
liable, because the responsibility of keeping the road in
repair was divided between him and the overseers, and there
was no definite, absolute duty on either.   But ordinarily it
would appear that the duties of these separate functionaries
are separable and distinct.   If the supervisors are em-
powered and required to provide for the care and repair
of the highways by general rules and orders delegating the
specific execution of the work to a road overseer or super-
intendent, and they have failed to do this, and damage to
third parties results from defects in the highway of which
they have notice, they, and not the road overseer, would seem
to be liable.   On the other hand, if the supervisors of the
county have made and given the necessary general provisions
and directions to impose this specific duty on the road over-
seer, he alone is responsible for the negligence.

In the case before us, the supervisors of the county of
Los Angeles, under the county charter, are relieved of the
duty of caring for the roads in the respective districts.   The
charter provides for a road commissioner, who will have
charge of the roads throughout the entire county, subject to
the general direction of the supervisors.   Section 27, article
XII, of the charter reads as follows: ''The road commis-
sioner, subject to such rules and regulations as shall be
prescribed by the board of supervisors, shall have direction
and control of all work of construction, *maintenance* and
*repair* of roads, highways and bridges, other than work done
under contract, and it shall be his duty to examine and·
inspect contract work as the same progresses, and see that
the same is properly performed, and when completed to
file his written approval thereof with the board of super-
visors.   He shall also have the control and management of
all county rock quarries and gravel pits, and all other
materials, property and instrumentalities necessary for and
connected with the construction, *maintenance* and *repair* of

roads and highways.'' The road commissioner, whose duties are thus fixed by law, is one of the appointive charter officers of the county. [14] We think that when the supervisors have, by appropriate general rules, regulations, and directions, provided for the maintenance and repair of the highways by the road commissioner, in the absence of specific knowledge of his failure to perform his duty in some particular case, they are relieved from responsibility for the results of his negligence.

It is contended here, however, that the supervisors did have notice of the dangerous condition of this bridge, and that it was not being safeguarded or repaired—indeed, that it could only be repaired by contract work, through action to be taken by the board; and that the negligence, therefore, was that of the supervisors for failing, within a reasonable time, to provide for such repairs. The Pridham Act of 1911 provides that ''no officer who has charge of or whose duty it is to care for or repair any street, highway, public building, public work or property shall be liable for any injury to person or property arising from the dangerous or defective condition thereof or failure to repair the same, unless such officer shall have had actual notice of such defective or dangerous condition, and shall have failed, for a reasonable time after such actual notice, to repair the same; provided that such officer had authority to remedy such condition, or to make such repair at the expense of the state or political subdivision thereof, and funds were available therefor.'' It may be observed, in passing, that this act does not seem to have been enacted to create or enlarge any liability of public officers for negligence in the performance of their duties beyond the liability already existing at law, but to limit such liability. [15] It is conceded here that the extensive repairs required on this bridge could not be made by the road commissioner without special action first taken by the board of supervisors, and such commissioner was therefore absolved from liability for delay in repairing the bridge. The jury found, by its verdict, that the supervisors, respondents here, had actual notice of the damaged and dangerous condition of the bridge, and that they failed to provide means for its repair within a reasonable period. [16] The evidence shows that they had notice by March 9, 1914, and that the repairs had not

been made on April 12, 1914, the date of the accident. It
is admitted that the cost for making the necessary repairs
was about one thousand four hundred dollars. Section 4041
of the Political Code requires that when the cost of con-
struction of a bridge exceeds five hundred dollars, such
work shall be done by contract, and let under prepared and
adopted plans and specifications to the lowest responsible
bidder, or, in case of emergency, by unanimous consent of
the board, the work may be done by day labor. It is
claimed by respondents that it was a matter of discretion
with the supervisors whether they should make the repairs
by contract or by day labor, and that there had not suf-
ficient time elapsed when the accident occurred to have done
the work under the contract provision. There does not ap-
pear to have been any move to do it either way. We agree,
however, that it was a matter of discretion with the super-
visors, not only as to the method of repair which they
might adopt, but as to when the repairs should be made,
or whether made at all. The season of the year, or the
prevalence of heavy rains and high waters, may have
rendered it advisable to postpone the work. The character
of the damage and the material of the bridge might sug-
gest the advisability of replacing it with a more substantial
structure of steel or concrete. We are satisfied that the
discretionary powers and duties of the supervisors, in the
matter of replacing the bridge, absolved them from liability
for this delay.

[17] If a cause of action existed here, either against the
commissioner or the supervisors, or both, it was for failure
to safeguard the approach to the dangerous break in this
bridge by barriers or warning signals, if there was such
failure. The trial court eliminated this question from the
case, however, by excluding all evidence offered by plaintiffs
to show negligence of the defendants in this respect; and, as
the question of error in such ruling is not involved in this
appeal, the issue thus suggested is not properly before us.
We are constrained to say, however, that it is difficult to con-
ceive a theory that would excuse public officials, whose
duty it is to maintain a highway in a reasonably safe con-
dition, from providing the most simple and obvious safeguard
by erecting a barrier or putting out warning lights at night,
at such a death-trap on a traveled highway. Though the

highway authorities may not have been bound to immediately replace this bridge in a safe condition for use, the common dictates of prudence required that it should not be left a menace to the life and limb of every unwary traveler. Liability for want of care in providing such warnings and safeguards has been universally applied by the courts, on general principles of the law of negligence, and irrespective of special enactments. Such rule of liability, as applying to highway and street officials, is recognized in *Doeg* v. *Cook*, 126 Cal. 213, [77 Am. St. Rep. 171, 58 Pac. 707], and *Dobbins* v. *City of Arcadia*, 44 Cal. App. 190, [186 Pac. 190]. Doubtless the ground on which the ruling of the court was made in this instance was the construction placed on the provisions of the Pridham Act. Literally applied, it gives support to such ruling. The language is that "no officer who has charge of, or whose duty it is to care for or repair any street or highway . . . shall be liable for any injury to person or property arising from dangerous or defective condition thereof or failure to repair the same, unless such officer shall have had actual notice of such defective or dangerous condition, *and shall have failed for a reasonable time after such actual notice to repair the same.*" Literally interpreted, it is declared that no liability shall attach from the dangerous condition of the highway until sufficient time has elapsed to make the necessary repairs, which in this case was shown to be a period of several weeks, at least. Surely the courts are not required to construe this provision of the Pridham Act to mean that such a place of danger may, with immunity, be left unguarded and without barriers or warnings until it can conveniently be repaired. The legislature was evidently dealing here with the question of liability for failure to make the repairs, and not with that of liability for failure to give necessary warning of the dangerous condition of the highway.

Because of the various errors in the trial of the case, herein pointed out, the order granting a new trial is affirmed.

Finlayson, P. J., and Thomas J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on March 13, 1920, and the following opinion then rendered thereon:

THE COURT.—Appellants have asked for a rehearing on this appeal in order to obtain a more explicit statement of the opinion of this court as to the liability of the county supervisors for failure, if there was such, to place barriers or warning signals at the place where a portion of the bridge was washed out by the floods.

This part of the opinion is expressly shown to be by way of *dictum*, and was only intended to make clear the point that we were not in accord with the contention that the Pridham Act absolved those in charge of the care and maintenance of highways from liability for negligence in failing to place warnings or barriers at dangerous breaks in the road until such time as it might be convenient to repair the break in the highway. We were not undertaking to say upon whom such liability would rest. Moreover, in another part of the opinion it is expressly stated that "where the supervisors have, by appropriate general rules, regulations, and directions, provided for the maintainance and repair of the highways by the road commissioner, in the absence of specific knowledge of his failure to perform his duty in some particular case, they are relieved from responsibility for the results of his negligence."

The petition for a rehearing is denied. But perhaps in the denial of the application we have sufficiently illuminated the "guide-post," which petitioners ask us to "repaint," to enable them to decipher the inscription thereon.

A petition to have the cause heard in the supreme court after judgment in the district court of appeal, was denied by the supreme court on April 7, 1920, and the following opinion then rendered thereon:

THE COURT.—In denying the application for a hearing in this court after decision by the district court of appeal of the second appellate district, division two, we are not to be understood as expressing or intimating any view as to the correctness of that portion of the opinion which relates to the matter of neglect of the commissioner or supervisors with regard to safeguarding the approach to the dangerous break on the bridge by barriers or warning signals. As is expressly stated in the opinion, this question is not involved in

this appeal and that portion of the opinion is purely by way of *dictum.*

The application for a hearing in this court is denied.

Angellotti, C. J., Shaw, J., Lawlor, J., Olney, J., and Kerrigan J., *pro tem.,* concurred.