[No. B059892. Second Dist., Div. Seven. Mar. 31, 1993.]

BETTY CHRONAKIS, Plaintiff and Appellant, v.
DAVID E. WINDSOR, Defendant and Respondent.

COUNSEL

Daniel R. Sheahan and Charlotte E. Costan for Plaintiff and Appellant.

Collins, Collins, Muir & Traver, John J. Collins and Karen B. Sharp for Defendant and Respondent.

OPINION

JOHNSON, J.—The underlying litigation in this case arises from an automobile accident in which plaintiff sustained personal injuries. The matter was tried to a jury which assessed plaintiff's comparative fault at 27 percent and awarded her $13,000 in economic damages and $25,000 in noneconomic damages. Plaintiff unsuccessfully sought a new trial based primarily on alleged juror misconduct. We agree the award of economic damages in this case was an improper quotient verdict and reverse that portion of the judgment. The award of noneconomic damages, on the other hand, appears unaffected by juror misconduct. We consequently affirm the verdict of noneconomic damages as well as the remainder of the judgment.

## FACTS AND PROCEEDINGS BELOW

Plaintiff, Betty Chronakis, had worked all her life in restaurants and bars or in various sales positions. When plaintiff and her husband relocated to Arizona, they purchased and operated a restaurant/bar/motel/gas station/ trailer park enterprise on a major highway. They sold the business in the early 1980's after plaintiff's husband became ill and the main highway closed. Thereafter, plaintiff retired to her home in Kingman, Arizona.

In 1988, plaintiff came to California to care for her ailing mother. After her mother passed away, plaintiff had nothing to occupy herself and needed money. Plaintiff was living with her brother and sister-in-law in North Hollywood and offered to work as a waitress at their restaurant. Initially, plaintiff only worked as a relief waitress, filling in for other waitresses who had called in sick or who were absent for other reasons. Eventually, plaintiff's average work schedule averaged four to five days, or about thirty-four hours per week. In 1989, plaintiff earned approximately $12,000. Based on those earnings, and an assumption plaintiff would work three more years, or until she turned age seventy-five, plaintiff's economic expert testified her total loss of earnings would be $36,000.

Plaintiff testified that before the accident she intended to return home to Arizona and seek employment two to three days a week as a hostess at some casino in Laughlin, Nevada. She stated she would not seek work as a waitress and did not think she was strong enough to carry the heavy change equipment required of a "change girl" in the casinos.

At 7:30 a.m. on January 5, 1990, plaintiff's sister-in-law, Ms. Bolwell, drove plaintiff to work at the restaurant in her Honda. To avoid rush hour traffic, she drove on residential streets. Plaintiff sat in the car with her body turned slightly to the right as she observed landscaping details in the residential neighborhood. Plaintiff did not wear a seat belt and Ms. Bolwell did not request plaintiff wear one.

From around the bend a Chevrolet Blazer 4 × 4 approached them driving down the center of the road. The drivers of the vehicles saw each other only seconds before impact. The Honda and Blazer crashed nearly head on. The Honda spun around 180 degrees and came to rest on or near the opposite curb.

The driver of the Blazer, defendant David E. Windsor, was uninjured. The two women were transported to a local hospital. Ms. Bolwell had suffered no injuries and was released from the hospital later that morning. Plaintiff, however, sustained a large laceration to her forehead which extended across her right eyebrow and into her right eyelid. Plaintiff's laceration was treated and she was released from the hospital three days later.

Several months after the accident, plaintiff had corrective plastic surgery to reduce the prominence of the forehead and eyebrow scars. Although plaintiff's appearance improved, both sides' medical experts agreed plaintiff continued to suffer from facial numbness, tingling and pain from damaged or severed nerves due to the laceration sustained in the accident. The medical

experts also agreed plaintiff probably suffered a concussion when her head made contact with the interior of the car during the accident. Plaintiff's doctor testified it was his belief lingering damage to the brain continued to cause plaintiff's impaired balance and coordination problems. Neither plaintiff nor her medical experts testified to any expenses for medical treatment incurred as a result of the accident.

The defendant's medical expert testified any difficulty plaintiff had in walking was due to normal deterioration caused by the aging process complicated by plaintiff's long-standing problems with diabetes, arthritis and a heart condition.

According to plaintiff's accident reconstruction expert, plaintiff likely hit her forehead on the dashboard. He noted the windshield had not been shattered and the doctors found no glass embedded in her skin. It was his opinion plaintiff probably would have struck something inside the vehicle and injured herself even if she had worn a seat belt. The defendant's accident reconstruction expert, on the other hand, testified it was his opinion plaintiff struck her forehead on the rear view mirror. Defendant's expert further testified it was his opinion plaintiff would not have suffered any injuries had she been wearing a seat belt. Both experts agreed each of the 2 cars was travelling at between 15 and 20 miles per hour.

By special verdicts the jury assessed 56 percent fault for the accident to defendant, 27 percent to plaintiff and 17 percent to plaintiff's sister-in-law, Ms. Bolwell. The jury unanimously awarded plaintiff economic damages of $13,000, and by a 10-to-2 vote, awarded her noneconomic damages of $25,000.

Plaintiff moved for a new trial, alleging the damage award was an impermissible quotient verdict, the damages awarded were inadequate as a matter of law and the insufficiency of the evidence to warrant a finding either plaintiff or her driver was negligent.

Because the trial judge, Lillian M. Stevens, was unavailable to hear the motion and would remain unavailable beyond the 60-day time limit for hearing such motions (Code Civ. Proc., § 660), Judge Thomas C. Murphy was assigned to hear plaintiff's motion for new trial. Unfamiliar with the facts of the case, Judge Murphy summarily denied plaintiff's motion for new trial and invited appellate review.

DISCUSSION

I. *The Impermissible Quotient Verdict on Economic Damages Must Be Reversed for New Trial.*

■■■ Plaintiff contends it was an abuse of discretion to deny her new trial motion because the verdicts were arrived at by chance. Code of Civil Procedure section 657, provides "The verdict may be vacated and any other decision may be modified or vacated, in whole or in part, and a new or further trial granted on all or part of the issues, on the application of the party aggrieved, for any of the following causes, materially affecting the substantial rights of such party: [¶] . . . [¶]

"2. Misconduct of the jury; and whenever any one or more of the jurors have been induced to assent to any general or special verdict, or to a finding on any question submitted to them by the court, by a resort to the determination of chance, such misconduct may be proved by the affidavit of any one of the jurors."

■■■ Chance is the "hazard, risk, or the result or issue of uncertain and unknown conditions or forces." (*Dixon* v. *Pluns* (1893) 98 Cal. 384, 387 [33 P. 268].) Verdicts reached by tossing a coin, drawing lots, or any other form of gambling are examples of improper chance verdicts. (7 Witkin Cal. Procedure (3d ed. 1985) Trial, § 361, p. 362.) ■■■ "The more sophisticated device of the *quotient verdict* is equally improper: The jurors agree to be bound by an *average* of their views; each writes the amount he favors on a slip of paper; the sums are added and divided by 12, and the resulting 'quotient' pursuant to the prior agreement, is accepted as the verdict without further deliberation or consideration of its fairness." (*Ibid.*, italics in original.)

This latter method of fixing a verdict was denounced by our Supreme Court in *Dixon* v. *Pluns, supra.* "In the present case each juror agreed that a definite amount should be the verdict of the jury, at a time when he had no knowledge whatever as to what the amount should be, for it had not yet been computed. No person even knew the figures upon which the computation would be made. If the estimate of each juror is before the eyes of the others when the agreement is made, then no element of chance will be found in the result, for it would be a mere matter of mathematical computation; but without knowledge of these estimates, the character of the verdict will be as entirely unknown to the jurors as though the whole matter were decided by the casting of a die, or the tossing of a coin. In the casting of a die, or the tossing of a coin, justice has an equal chance with injustice, but under the

system here considered, one unscrupulous and cunning juror always has the power to defeat justice by increasing or decreasing the amount of the verdict in proportion as he places his estimate at an unconscionably high or low figure." (*Dixon* v. *Pluns, supra*, 98 Cal. at p. 387 [reversed for new trial due to quotient verdict]; see also, *Ham* v. *County of Los Angeles* (1920) 46 Cal.App. 148, 153 [189 P. 462] [new trial order affirmed due to quotient verdict]; *Buhl* v. *Wood Truck Lines* (1944) 62 Cal.App.2d 542, 545 [144 P.2d 847] [same].)

In support of her motion for new trial plaintiff produced juror affidavits tending to demonstrate the jurors agreed in advance to be bound by the average of their respective views of a proper award of damages. One juror affidavit stated: "[d]uring the jury deliberations, it was agreed that each juror would write down an amount for the plaintiff, and the average of these twelve figures would be the final award to be submitted to the court. It was discussed that each juror was able to provide his or her individual award amount, however, the averaged award was final. This form of computing the award was agreed upon before the individual amounts were written down." This juror affidavit is prima facie evidence the verdict on plaintiff's economic damages—which was the only damage verdict agreed to by all 12 of the jurors—was a quotient verdict and that the jurors were induced to assent to the verdict by resort to chance.

Three other juror affidavits provide further proof the verdict on economic damages was an impermissible quotient verdict. A second juror affidavit stated: "[d]uring deliberations there was such a wide discrepancy between the jurors['] feeling so it was discussed and decided that we would all write down a figure as to what we felt would be a proper award for Mrs. Chronakis. . . . There was [*sic*] figures between the juror[s] varying between $1.00 for Mrs. Chronakis to $100,000. Since it was so wide we could not reach a figure, we decided to each write down a figure, add the total and divide by twelve. This is how the award was determined. . . ."

A third juror affidavit stated: "[i]n the deliberations the foreman suggested that the final damage amount be obtained by each juror writing down an amount for plaintiff and then the total would be divided by twelve. We agreed at this before individual damage amounts were set. . . . The averaged awarded amount was to be the final amount given to plaintiff."

A fourth juror affidavit stated: "[t]o the best of my recollection it was jury foreman . . . who suggested the manner of figuring the amount to be awarded to Mrs. Chronakis. [¶] Each juror was asked to state the amount of money he/she thought should be awarded. These amounts were then added

up and the result divided by twelve (12). Also, I recall that at least six (6) of the jurors stated Mrs. Chronakis only [*sic*] be awarded $1.00 to $1.50 only."

Based on these juror affidavits it is apparent the jurors agreed in advance to be bound by the average of their views without further deliberation. As such, the verdict was an improper quotient verdict and this portion of the judgment must be reversed for new trial. (Code Civ. Proc., § 657, subd. 2.)

Defendant filed no counteraffidavits in opposition to plaintiff's motion for new trial. Thus the acts alleged in plaintiff's affidavits are deemed admitted. (*Tapia* v. *Barker* (1984) 160 Cal.App.3d 761, 766 [206 Cal.Rptr. 803].) He nevertheless suggests this is not an illegal quotient verdict because the affidavits indicate the averaged amount may have been rounded off which in turn indicates there may have been further deliberation before submitting the economic damage award of $13,000 to the court. ■■■ "It is true, . . . there is no impropriety in the jurors making an average of their individual estimates as to the amount of damages for the purpose of arriving at a basis for discussion and consideration, nor in adopting such average if it is subsequently agreed to by the jurors; but to agree beforehand to adopt such average and abide by the agreement, without further discussion or deliberation, is fatal to the verdict." (*Ham* v. *County of Los Angeles, supra,* 46 Cal.App. at pp. 153-154.)

Thus, evidence an average figure was later rounded either up or down has been held definitive proof the jurors were not bound by their agreement to adopt the average figure as their final verdict. Consequently, such verdicts are not considered improper because they indicate further consideration and deliberation by the jurors in agreeing on the rounded-off figure. (See, e.g., *Will* v. *Southern Pacific Co.* (1941) 18 Cal.2d 468, 477 [116 P.2d 44] [not improper quotient verdict because counteraffidavits proved jurors later voted on rounded off average figure]; *Monroe* v. *Lashus* (1959) 170 Cal.App.2d 1, 6 [338 P.2d 13] [not improper quotient verdict because counteraffidavits asserted jurors did not agree to be bound by average figure and evidence of rounding off appeared on all affidavits]; *Glass* v. *Gulf Oil Corp.* (1970) 12 Cal.App.3d 412, 435 [96 Cal.Rptr. 902] [evidence averaged figure rounded off before jurors arrived at final figure appeared on face of affidavits].)

■■■ Defendant contends rounding off must have occurred in this case because the juror affidavits indicated several of the jurors were in favor of returning a damage award of only $1 or $1.50. Defendant therefore contends, because the final damage award of $13,000 in economic damages has no odd dollars or cents, the jurors must have subsequently agreed to round off the figure arrived at by averaging. This argument, however, presumes

some of the jurors actually voted for $1 or $1.50 verdicts when the crucial vote was taken. However, there is no evidence to support this argument. Two of the juror affidavits describe how some of the jurors discussed the propriety of only a nominal award. These discussions, however, took place before the agreement to be bound by the average of their views. There is no evidence in the record to indicate exactly how the jurors actually voted. Consequently, it is just as likely those jurors who believed any damage award too much voted to award nothing, which could have produced a quotient of precisely $13,000.

To accept defendant's argument we would need to draw inferences on inferences from those juror affidavits in favor of the verdict. First, we would have to infer some of the jurors actually submitted $1 or $1.50 as their estimate on economic damages. Second, we would have to infer the jurors thereafter agreed to round the average figure off to arrive at the final verdict of $13,000. No case we are aware of has relied on inferences from juror affidavits to find evidence sufficient to rebut prima facie evidence of a quotient verdict. Instead, the cases indicate the only evidence sufficient to rebut prima facie evidence of a quotient verdict is affirmative credible statements in counteraffidavits declaring a verdict was not the result of chance, or affirmative statements or evidence of subsequent consideration and deliberation by the jury, or where evidence of rounding off the average figure is apparent on the face of the affidavits. (See, e.g., *Dixon* v. *Pluns, supra*, 98 Cal. 384 [reversed, no counteraffidavits to rebut evidence of quotient verdict]; *Ham* v. *County of Los Angeles, supra*, 46 Cal.App. 148 [reversed due to quotient verdict, counteraffidavits not credible]; *Buhl* v. *Wood Truck Lines, supra*, 62 Cal.App.2d 542 [same]; *Will* v. *Southern Pacific Co., supra*, 18 Cal.2d 468 [credible counteraffidavits demonstrated average figure later rounded off and reconsidered]; *Monroe* v. *Lashus, supra*, 170 Cal.App.2d 1 [same]; *Glass* v. *Gulf Oil Corp., supra*, 12 Cal.App.3d 412 [same]; *McDonnell* v. *Pescadero & San Mateo Stage Co.* (1898) 120 Cal. 476 [52 P. 725] [counteraffidavits demonstrated average figure only basis for discussion]; *Bardessono* v. *Michels* (1970) 3 Cal.3d 780 [91 Cal.Rptr. 760, 478 P.2d 480, 45 A.L.R.3d 717] [same]; *Foley* v. *Hornung* (1917) 35 Cal.App. 304 [169 P. 705] [same]; *Unger* v. *San Francisco-Oakland Rys.* (1923) 61 Cal.App. 125 [214 P. 510] [same]; *Balkwill* v. *City of Stockton* (1942) 50 Cal.App.2d 661 [123 P.2d 596] [same]; *Diamond Springs Lime Co.* v. *American River Constructors* (1971) 16 Cal.App.3d 581 [94 Cal.Rptr. 200] [same].) We decline any implied invitation to expand the methods of rebutting evidence of chance verdicts.

■ Defendant also suggests the verdict is not an improper quotient verdict because each juror affirmed the verdict as his or her own when polled

in open court. We fail to understand how the jurors acknowledging their agreement to be bound by the quotient figure somehow saves an otherwise improper verdict. Claiming the verdict as his or her own in open court is merely carrying out the jurors' prior agreement to be bound by whatever figure represented the average of their views. Defendant cites no authority for this novel proposition and we have found none. Indeed, allowing such after the fact activity to redeem a verdict arrived at by chance would run counter to the very purpose of prohibiting quotient or chance verdicts.

As stated in *Balkwill* v. *City of Stockton, supra,* 50 Cal.App.2d 661, "[t]he purpose of the statute which prohibits the rendering of a verdict which is the result of chance is to preserve the benefit to litigants of the independent judgment of jurors with respect to either the party who is to prevail or the amount of damages to be awarded. Chance verdicts are destructive of the very foundation upon which the right of trial by jury is based. But the amount which will adequately compensate one for personal injuries is not usually susceptible of mathematical calculation. Reasonable men will differ greatly in that regard. The honest and fair judgment of jurors is all that may be expected in such litigation." (*Balkwill* v. *City of Stockton, supra,* 50 Cal.App.2d at p. 672.)

Because the juror affidavits establish the verdict in this case was an improper quotient verdict, plaintiff is entitled to a new trial on the issue of her economic damages. (Code Civ. Proc., § 657, subd. 2.)

II.  *The Jurors' Consideration of Plaintiff's Financial Situation Was Not Misconduct Under the Circumstances of This Case.*

Plaintiff contends the jury committed further misconduct when it considered "collateral sources" of income. The same juror affidavits indicated the jurors discussed possible proceeds from the sale of her business in the early 1980's, plaintiff's intention to return to her home in Arizona and the likelihood plaintiff would retire in Arizona and live on her Social Security income. At least some of the jurors believed because of these sources of income and because of plaintiff's advanced age, she had adequate financial security regardless of the jury's verdict.

Evidence Code section 1150, subdivision (a) provides: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or

concerning the mental processes by which it was determined." Thus, the Legislature sought to distinguish between "proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved, . . . ." (*People* v. *Hutchinson* (1969) 71 Cal.2d 342, 349 [78 Cal.Rptr. 196, 455 P.2d 132].) "This limitation prevents one juror from upsetting a verdict of the whole jury by impugning his own or his fellow jurors' mental processes or reasons for assent or dissent." (*Id.* at p. 350; see also *Krouse* v. *Graham* (1977) 19 Cal.3d 59, 80 [137 Cal.Rptr. 863, 562 P.2d 1022].)

Applying these principles, we must reject the allegations of misconduct predicated on the jurors' consideration of plaintiff's personal financial situation. First, these matters were not outside the evidence as plaintiff alleges. Plaintiff testified one of the reasons she lived in Kingman, Arizona was because she could not have "survived on her Social Security" anywhere else. Plaintiff also testified to selling the business she and her husband had owned for years in Arizona and about her intention to return to her home there. These facts were part of the evidence in the case, offered, presumably, on the issue of the likelihood of plaintiff carrying out her alleged intention to work two to three days a week when she returned to Arizona. Resolution of that issue, in turn, bore directly on the issue whether it was reasonably certain plaintiff had suffered or would suffer lost earnings as a result of her injuries. We discern nothing improper in jurors discussing evidence actually presented in the case during its deliberations. (Compare, *Tapia* v. *Barker*, *supra*, 160 Cal.App.3d 761, 766 [juror consideration of how either disability, welfare or unemployment should reduce plaintiff's loss of earnings were considerations of collateral sources of income which were outside the evidence and therefore improper].) Thus, the juror affidavits in this case do not raise an inference of improper influence on juror deliberations by the receipt of extrajudicial evidence.

Secondly, plaintiff would have this court delve into the effect the discussions about plaintiff's finances had on the ultimate damage awards made in the case. She contends the juror declarations prove certain jurors were influenced by these discussions and therefore must have voted for low damage awards. This contention essentially asks us to examine the jurors' subjective reasoning processes. This is not acceptable under Evidence Code section 1150. (*Moore* v. *Preventive Medicine Medical Group, Inc.* (1986) 178 Cal.App.3d 728, 741 [223 Cal.Rptr. 859].)

Thus, while the conduct of jurors discussing plaintiff's financial situation may be scrutinized, the effect of this conduct on subsequent votes may not be. When the latter is excluded, the former standing alone, does not implicate juror misconduct. Nor does the record otherwise demonstrate some

members of the jury were prevented from freely expressing their views an award of $100,000 or so would be an appropriate verdict. (*People* v. *Cox* (1991) 53 Cal.3d 618, 695 [280 Cal.Rptr. 692, 809 P.2d 351].)

We conclude reversal of the judgment is not required based on the alleged juror misconduct asserted here.

### DISPOSITION

The verdict for plaintiff's economic damages is reversed and remanded for new trial. The verdict for noneconomic damages is affirmed, and the judgment is otherwise affirmed in every other respect. Each party to bear own costs.

Lillie, P. J., and Woods (Fred), J., concurred.