Filed 4/22/21  Amedee Geothermal etc. v. Lassen Municipal Utility Dist. CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Lassen)

----

| | |
|---|---|
| AMEDEE GEOTHERMAL VENTURE I, | C086978 |
| Plaintiff and Appellant, | (Super. Ct. No. 59485) |
| v. | ORDER MODIFYING OPINION AND DENYING REHEARING |
| LASSEN MUNICIPAL UTILITY DISTRICT, | |
| Defendant and Respondent. | [NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion filed March 26, 2021, in the above cause is modified as follows:

1.  On page 13, replace the second full paragraph, beginning with "Here, Amedee expressly limits," with the following:

Here, Amedee argues that its "challenge was not based on anything a juror said during voir dire but on the undisputed facts . . . showing that LMUD ratepayers have a financial interest in the outcome of this case. Whether those undisputed facts require disqualification is a pure issue of statutory interpretation that does not depend on anything the trial court

1

perceived about individual prospective jurors."  Thus, the resolution of this issue turns on Code of Civil Procedure section 229.

2.      On page 27, the sentence reading "Notably, Amedee does not quote the language employed by the trial court that is asserted to be erroneous" is deleted in its entirety.

In light of these modifications, which do not change the judgment, the petition for rehearing filed by Amedee Geothermal Venture I is denied.

FOR THE COURT:


 /s/
RAYE, P. J.


 /s/
ROBIE, J.


 /s/
HOCH, J.

Filed 3/26/21  Amedee Geothermal etc. v. Lessen Municipal Utility Dist. CA3 (unmodified opinion)

NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Lassen)

----

| | |
|---|---|
| AMEDEE GEOTHERMAL VENTURE I, | C086978 |
| Plaintiff and Appellant, | (Super. Ct. No. 59485) |
| v. | |
| LASSEN MUNICIPAL UTILITY DISTRICT, | |
| Defendant and Respondent. | |

Amedee Geothermal Venture I (Amedee) claims the Lassen Municipal Utility District (LMUD) caused the catastrophic failure of its generator by replacing a 34.5 kilovolt power line with one with a 12.47 kilovolt capacity.  Amedee brought an unsuccessful action against LMUD in federal court before filing this case in San Francisco Superior Court.  The case was subsequently transferred to Lassen County and the claims for negligence causing a dangerous condition and breach of contract were tried to a jury.  The jury returned a defense verdict, and a bench trial on Amedee's inverse condemnation also found in favor of LMUD.

1

On appeal, Amedee contends (1) the trial court erred in refusing to categorically exclude LMUD ratepayers from the jury, (2) the jury misinterpreted a limitation of liability clause in the transmission agreement between Amedee and LMUD, (3) the trial court erroneously dismissed Amedee's claim for negligence under Government Code section 815.2[1] based on governmental immunity, and (4) the trial court committed reversible error in denying the inverse condemnation claim by relying on findings not actually made by the jury.[2]

We conclude Code of Civil Procedure section 229, subdivision (d), did not require categorical exclusion of all LMUD ratepayers from the jury for implied bias. We further conclude Amedee has not preserved for appeal the issue of the jury's interpretation of the transmission agreement. Amedee did not timely raise the issue when the issue could have been properly addressed in the first instance in the trial court. The trial court correctly concluded the decision to replace the power line to Amedee's geothermal plant with a different voltage capacity was an action subject to immunity under section 820.2. Finally, the record shows the trial court engaged in independent and detailed fact finding before determining Amedee had not proven its inverse condemnation claim. Accordingly, we affirm the judgment.

BACKGROUND

### Jury Trial on Breach of Contract and Dangerous Condition Claims

As this court has previously admonished, "In every appeal, 'the appellant has the duty to fairly summarize all of the facts in the light most favorable to the judgment.' [Citation.] 'Further, the burden to provide a fair summary of the evidence "grows with

---

[1] Undesignated statutory citations are to the Government Code.

[2] While at the end of each section of its brief LMUD includes an argument that the cause of action is barred by the applicable statute of limitations, we shall decide this appeal based on the merits of the arguments.

the complexity of the record." ' " (*Myers v. Trendwest Resorts, Inc*. (2009) 178 Cal.App.4th 735, 739, quoting *Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1658.)  Ignoring this duty, Amedee recites the evidence in its favor and mostly ignores the evidence supporting the defense verdict.  Based on our review of the transcripts, the evidence in the light most favorable to the judgment showed the following:

Amedee is a geothermal power plant located in Lassen County to take advantage of energy from local hot springs to generate electricity for sale to the Pacific Gas & Electric (PG&E) company.  While the Amedee plant was being planned, PG&E offered 10-year contracts to purchase power at rates favorable to electricity providers.  The Amedee geothermal project was designed by Barber-Nichols Engineering (Barber-Nichols).

At the Amedee plant, hot water comes up from underground and runs into a tank filled with small tubes containing R-114 (freon).  The freon turns into a high-pressure gas that turns a turbine that in turn generates electricity.  The freon flows through a cooling tower, returns to liquid form, and cycles back to the heat exchanger tank.  When operational, Amedee is a net power generator.  However, the geothermal plant requires an external source of electricity to start the brine pumps that bring up the geothermally heated water to initiate the power generation cycle.

When Amedee's geothermal power plant was completed in 1988, it received electrical service from CP National Corporation (CP National) pursuant to a transmission agreement (the transmission agreement).  Amedee received power through a 34.5 kilovolt line.  CP National's utility system was subsequently purchased by LMUD, which assumed responsibility for CP National's service obligations and the transmission agreement with Amedee.  The transmission agreement provides, in part:  "In the event that changes required to be made to [LMUD's] system require [Amedee] to change its small power production facility and interconnection facilities in order to continue

3

deliveries of energy and capacity pursuant to this Agreement, [Amedee] may elect to make such changes at no cost to [LMUD] or terminate this Agreement.  [LMUD] represents that, as of the date of this Agreement, it has no plan to change its transmission voltage in the foreseeable future."

The transmission agreement also contains the following limitations on liability of the parties in section 8:

"8.1  Nothing in this Agreement shall be construed to create any duty to, any standard of care with reference to, or any liability to any person not a party to this Agreement.  Neither Party shall be liable to the other for consequential, indirect, or incidental damages.

"8.2  Neither Party shall be liable to the other for damages, whether direct, indirect, consequential, incidental, or general in nature, that arise by reason of electrical disturbances or faults caused by the operation, faulty operation, or nonoperation of the Party's facilities, whether or not such operation, faulty operation, or nonoperation was occasioned by or accompanied with the active or passive negligence of the Party."

The transmission agreement does not specify that power to the geothermal project must be provided at 34.5 kilovolts.

Operations at Amedee's plant turned out to generate less power that its planners had forecast during the planning phase.  In some years, there was insufficient income to pay Amedee's investors.  After the initial 10-year PG&E pricing structure expired, income dropped substantially for Amedee's plant.  In 1997, Amedee's plant manager reported to the county assessor's office that Amedee "is not currently profitable and the situation is only expected to worsen as the power price declines radically after the end of the fixed price period."  Similarly negative reports were filed with the county assessor in 1998 and 2000.  Amedee's plant manager, who had been there from the beginning, left the project at the end of 2000 to further reduce operating costs.  When the plant manager left, he knew Amedee had a problem in its dependence on freon for its operations.

4

In the 1990's, freon was banned from production and sale in the United States. By 2003, Amedee's plant manager reported, "A lack of R-114 freon is the biggest problem." Equipment at the plant had to be shut down for lack of sufficient freon. The freon problem worsened as aging equipment leaked the fluid. Amedee's plant suffered from the age of its mechanical components. Thus, the manager believed "that the company needed to put more money in to get more out." When an induction generator went offline for lack of freon, Amedee did not purchase more of the fluid. Without the induction generator, Amedee's capacity to produce power was reduced. In September 2009, the plant manager reported that more equipment was leaking freon. That same month, one of brine pump motors failed and had to be replaced.

LMUD developed a capital improvement plan that involved replacing the 34.5 kilovolt line to the Amedee plant with a 12.47 kilovolt line. Amedee's power line was the only 34.5 kilovolt line among all of LMUD's customers. Sometime before September 2009, LMUD asked Amedee's plant manager "if they could change our transformers." The plant manager responded that he would have to ask Amedee's owners. The plant manager testified: "I informed [Amedee's owners] that LMUD had spoken to me about lowering the line voltage and [the owners] appreciated me telling them that. And I don't – that was in their hands from that point on."

LMUD asked when "would be a good time to change out our transformer," and the plant manager responded the best time would be during fall maintenance and gave the scheduled date for that maintenance. As scheduled, Amedee shut down its operations. Amedee's plant manager issued a maintenance log reporting "that we had shut the plant down for our fall maintenance and that LMUD was beginning to change out the old transformer for the new transformer." LMUD completed its work between October 31, 2009, and November 6, 2009.

Amedee attempted to restart its operations by starting two motors simultaneously. During the first two attempts to restart Amedee's system, the turbine "oversped a little bit

5

and some of the automatic controllers shut the plant off." This sometimes happened in the cooler winter months when the temperature differential between the geothermal water and the ambient air increased. On the third attempt to restart, the generator breaker failed to close and the generator "came apart." When the plant manager "turned around, the inside of the turbine building . . . was so dusty you couldn't even make out the equipment inside. There was debris falling down from everywhere."

In 2010, Amedee hired the designer of the plant, Barber-Nichols, "to do an investigation of the root cause of the generator explosion." Barber-Nichols issued reports stating that "a possibility was that a fan had broken and that's what caused the overspeed event" that destroyed the generator. The reports also posited other mechanical scenarios that caused the generator's destruction. None of the scenarios were related to the voltage supplied to Amedee's plant.

In February 2013, Amedee hired a litigation expert, Loren Bandt. Amedee did not provide Bandt with a copy of the Barber-Nichols postaccident reports during Bandt's investigation. Instead, Bandt saw the Barber-Nichols reports for the first time during trial. Bandt acknowledged there were many possibilities as to why the generator failed on restart. Bandt was advised that after the generator had been repaired, Amedee successfully restarted the plant. If Bandt's assumptions underlying his load flow modeling was based on incorrect information supplied to him about Amedee's plant or equipment, his results would be doubtful. Bandt testified that fan failure as a result of an overspeed event was not inconsistent with his opinion that low voltage caused the event. In his investigation, Bandt did not "identify a cause more likely than the low voltage impact" to explain the generator failure on startup.

LMUD called Kerry Hartung as a witness to testify about his experience with LMUD's 2009 change of the voltage line to Amedee's plant. Hartung worked as an electric consulting engineer for CP National and later for LMUD. He worked doing load flow studies and equipment settings for voltage regulators, substation design, and

6

substation rehabilitation.  Hartung was asked by LMUD to write the specification for the new transformer at the Amedee plant that would accompany the line voltage change.  Although LMUD did not ask him to do a load flow study, Hartung did a capacity study to ensure there was sufficient capacity on the circuit for the Amedee plant.  Hartung made calculations "using the loads and the generators on the circuit that was there at the time serving Amedee and in order to see if the circuits could handle those loads in the generation."  He testified that "after I did the capacity study on the spreadsheet, it was obvious to me that everything would work and that a system impact study would not be necessary."  Hartung gave the information to LMUD so that it could specify the correct voltage for the transformer that would be purchased for installation at Amedee's site.

Several months after the voltage change took place, Hartung heard from Amedee's manager who reported "that there was a high voltage problem at Amedee."  The manager asked Hartung to "please check it out."  By that time, the Amedee plant was running again but "not generating the kind of kilowatts that they wanted to generate."  In fall 2010, Hartung and an LMUD technician went to the plant and measured the voltage at 129 volts on a 120-volt base.  LMUD then adjusted the voltage at Amedee to approximately 125 volts.  This adjustment resolved the problem for both LMUD and Amedee.

In February 2011, Hartung was involved in troubleshooting another problem at the Amedee plant.  There was a power outage on the PG&E electrical grid that supplies power to LMUD.  Amedee had "some problems when they tried to start back up again."  One of the problems was that the plant could not start one of their brine pumps to bring up the geothermal water.  Hartung went to Amedee and found that "there was no reduced voltage starting – or starting assistance of any kind on the motor.  . . . And it was creating a very large voltage drop on their equipment and the LMUD system.  [¶]  So I made a recommendation that they put in a soft start . . . which reduces that starting current on the motor.  When we put that in, it solved the problem."

7

In May 2011, Amedee attempted to start another brine pump motor. The motor burned out and Amedee had to replace it. Amedee again asked Hartung for assistance. He recommended that Amedee replace a faulty underground conductor with a bigger conductor wire. This wire went from LMUD's transformer through Amedee's switch gear and to their brine pump. Further investigation showed the pumps had three-phase motors. The broken pump had one phase that was dead. The problem was resolved by fixing an open or blown fuse on one phase of the 12-kilovolt to a 4-kilovolt transformer.

Amedee's owners shut down the geothermal plant in 2014.

The jury returned a defense verdict. As to the breach of contract claim, the jury made the following findings: "Amedee prove[d] that LMUD breached its contract with Amedee," and "Amedee prove[d] that it did not discover and did not know of facts before August 15, 2010 that would have caused a reasonable person to suspect that it had suffered harm that was caused by LMUD's breach." LMUD did not "prove that Amedee freely and knowingly gave up its right to have LMUD perform its obligation to provide adequate notice of the change in the line voltage." However, the jury found "LMUD prove[d] that either Section 8.1 or 8.2 of the Transmission Agreement appl[ies] to Amedee's contractual damages claims." In response to a postverdict question by the trial court, the jury "announced that they had relied on section 8.2" to conclude LMUD was not liable to Amedee on the breach of contract claim. "When asked by the court if jurors understood that their combined verdicts and findings would mean that plaintiff Amedee would receive nothing from its lawsuit and if that was the intention of the jury, . . . all jurors answered in the affirmative."

As to Amedee's negligence claim, the jury found Amedee did not "prove that it was harmed by a dangerous condition of LMUD's property."

***Bench Trial on Inverse Condemnation***

After the jury reached its verdict, a bench trial ensued on Amedee's inverse condemnation claim. In its final ruling on Amedee's inverse condemnation claim, the trial court made factual findings – including the following:

"The Amedee plant suffered, both before and after the accident, from at least three chronic problems, all of which caused issues with getting the brine pumps started and with getting the generator started and with getting the plant online. One was the problem of lack of adequate freon, and leaking freon, the plant's operating fluid. 40,000 pounds of freon was optimal for the plant, it often operated with half of that. When the plant was offline, components would shrink, seals would crack, and leaks from valves and other components would occur, and there would be insufficient fluid to run the turbine. Freon was hard to get, was expensive, and was banned by the federal government long before the accident. The second chronic problem was aquification to the surface of hot water around the well casings, and the financial inability of Amedee to correct the problem. The hot water at the surface eventually (after the line change) resulted in the destruction of one of the pump motors and damage to the well itself. Also, Amedee's 2nd generator, the induction generator was taken off line permanently in 2008, a year before the accident, due to flooding and freon issues. Both of these problems were aggravated when the plant was offline for long periods, and the plant was offline for two months before the generator accident. Either of these problems could keep the plant from operating. Finally, there was clearly a problem with a lack of adequate maintenance and a failure to replace aging parts and components. Numerous components had already failed and then [been] replaced, including a turbine and a main transformer. A failure of the generator or its fan is as plausible a cause of the accident as any other, perhaps more so. Add to that the dearth of evidence of any inherent flaw in changing a 34.5 [kilovolt] line to a 12.47 [kilovolt] line and the conclusion is clear: [Amedee] has been unable to prove that

9

LMUD substantially caused the synchronous generator accident by a preponderance of the evidence."

"[A]s circumstantial evidence, the fact that nobody connected with this case, including the whole Amedee staff, including . . . Paolucci, their electrician, and the whole LMUD contingent which planned and executed the line change, people who work with these lines every day, had any concern whatsoever that the line change could harm Amedee is instructive, as is the fact that nobody came to that conclusion for years after the incident occurred.  The immediate study of the cause of the accident by the engineering firm, Barber-Nichols, which designed and built the Amedee plant was not introduced into evidence or tested at trial, but the evidence does show that it pointed the finger at something other than the line change.  Again, as circumstantial evidence, the fact that Amedee's new generator never failed with 12.47, nor did [nearby geothermal plant] Wineagle's, in some 4 years of operations, is instructive as well.  Also, all 12 jurors concluded that LMUD's line change did not negligently create a dangerous condition as to the Amedee plant."

Regarding Amedee's two expert witnesses, Anton Smeerdyk and Bandt, the trial court found that "[n]either concludes . . . that the line change caused the generator damage.  [Paolucci] concludes, speculatively in the court's view, that the problem was not on Amedee's side, and therefore must have been on LMUD's, but doesn't explain what LMUD's problem was, or how it caused the damage.  [Bandt] surmises that of a number of possible causes, he cannot identify one more likely than the line change.  Significantly, in October of 2011, a year after the plant had been in operation using the new generator, undervoltage problems occurred.  [Paolucci] used a Fluke meter and interpreted its data to mean there was undervoltage on LMUD's line.  But repairs were made to Amedee's electrical equipment, and per correspondence from Jim Ausmus to Paolucci, that particular undervoltage problem was resolved and the plant was back online and working well.  Two of the experts, including Smeerdyk, testified that even if

10

voltage drops occur, they are not 'dangerous.'  None of these positions or opinions constitute persuasive proof that the line change was more likely the cause of the damage than not.  There are simply too many unanswered variables to come to that conclusion."

The trial court entered judgment in favor of LMUD.  Thereafter, Amedee timely filed a notice of appeal.

DISCUSSION

I

### Motion to Disqualify All LMUD Ratepayers from the Jury

Amedee argues all LMUD ratepayers were disqualified from the jury for implied bias under Code of Civil Procedure section 229, subdivision (d), regardless of whether these jurors harbored actual bias against it.  We disagree.

A.

### LMUD Ratepayer Jurors

Before trial, Amedee moved to exclude from the jury all LMUD ratepayers for implied bias under Code of Civil Procedure sections 222.5 and 229.  LMUD opposed the motion.  The trial court determined LMUD ratepayers were not categorically excluded from the jury for implied bias.  However, the trial court decided to inform prospective jurors that a large award in favor of Amedee "could or would indeed have a financial impact on subscribers of LMUD, many of whom are our potential jurors and probably most of our potential jurors fall into that category."

During voir dire, the trial court told jurors:  "If there were to be a judgment against LMUD and if it were to be of a certain amount, there could be a hike in the utility rates of LMUD customers.  [¶]  Now, that's not a for sure thing by any means.  And if it were to occur, if there were to be a judgment and if it were of a sufficient magnitude, there could be a rate hike and it could be up to something in the neighborhood of 50 to $60 a year.  So relative to your utility bill, it's not a large thing.  But it's potentially a thing."  The

11

trial court subsequently asked prospective jurors to raise their hands if the possible rate increase affected any juror's ability to be fair and impartial.

Ultimately, five prospective jurors expressed initial reservation about potential utility rate increases – including two jurors who were selected: K. and A. During voir dire, K. asked whether the impact to an LMUD rate payer would be "five dollars a month, basically?" The trial court answered the five-dollar increase might be that "over ten years there would be a maximum of about that per month. Roughly." Later during voir dire, Amedee's trial attorney asked whether a potential rate hike was a concern of K. K. responded, "Five bucks is not a big deal to me at all." On further questioning, K. allowed: "Twenty bucks, maybe."

Juror A. was another LMUD ratepayer who expressed concerns about a rate increase. Juror A. explained he "had four boys" and was "constantly watching every single penny" to cover bills. Asked whether he could nonetheless be fair, Juror A. answered that he "would probably still be fair."

**B.**

### *Implied Bias*

The right to a jury trial encompasses the right to unbiased and unprejudiced jurors. (*In re Boyette* (2013) 56 Cal.4th 866, 888.) To this end, the Legislature has provided for removal of jurors on grounds of implied or actual bias. Code of Civil Procedure section 225, subdivision (b)(1)(B) and (C), provide that challenges to jurors for cause may be made on grounds of implied bias "as, when the existence of the facts as ascertained, in judgment of law disqualifies the juror," or for actual bias when "the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party."

12

The Code of Civil Procedure limits grounds on which jurors may be excused for implied bias. "Under California law, a juror may be excused for 'implied bias' only for one of the reasons listed in Code of Civil Procedure section 229, 'and for no other.' (Code Civ. Proc., § 229.) If the facts do not establish one of the grounds for implied bias listed in that statute, the juror may be excused for '[a]ctual bias' if the court finds that the juror's state of mind would prevent him or her from being impartial. (Code Civ. Proc., § 225, subd. (b)(1)(C).)" (*People v. Ledesma* (2006) 39 Cal.4th 641, 670.)

Here, Amedee expressly limits its challenge to the assertion jurors A. and K. were LMUD ratepayers who were disqualified for implied bias by operation of law under Code of Civil Procedure section 229, subdivision (d). Amedee disclaims challenging the trial court's determination jurors A. and K. were not actually biased. Thus, the resolution of this issue turns on Code of Civil Procedure section 229.

Code of Civil Procedure section 229, subdivision (d), provides for excusing a juror on the ground of an "[i]nterest on the part of the juror in the event of the action, or in the main question involved in the action, except his or her interest as a member or citizen or taxpayer of a county, city and county, incorporated city or town, or other political subdivision of a county, or municipal water district." Section 229 does not define "interest" for purposes of determining whether a juror fits into the category of implied bias set forth in subdivision (d).

This court examined subdivision (d) of Code of Civil Procedure section 229 in *Kimbley v. Kaiser Foundation Hospitals* (1985) 164 Cal.App.3d 1166 (*Kimbley*). *Kimbley* involved a claim for medical malpractice against Kaiser Foundation Hospitals (Kaiser). (*Id.* at pp. 1167-1168.) Prior to trial, plaintiff's counsel moved to exclude all members of the Kaiser health plan for implied bias on grounds that " 'any member of the Kaiser Plan is a person financially interested in the case.' " (*Id.* at p. 1168.) The trial court denied the motion, "[s]tating, 'there has to be some showing for cause.' " (*Ibid.*) The plaintiff appealed, contending the predecessor statute to Code of Civil Procedure

13

section 229 required the exclusion of all Kaiser plan members of the jury for implied bias. (*Kimbley,* at p. 1170.) In language similar to the current provisions of Code of Civil Procedure section 229, subdivision (d), the predecessor implied bias statute provided for excusal of prospective jurors for " '[i]nterest on part of the juror in the event of the action, or in the main question involved in the action, except his [or her] interest as a member or citizen or taxpayer of a county, city and county, . . .' " (*Kimbley,* at p. 1170.) This language, plaintiff argued, required exclusion of all Kaiser plan members as a matter of law. (*Ibid.*)

This court affirmed the trial court's denial of the motion for blanket exclusion of all Kaiser plan members from the jury. (*Kimbley*, *supra*, 164 Cal.App.3d at pp. 1170-1171.) *Kimbley* notes that plaintiff's motion in essence "merely moved for juror exclusion on the ground that Kaiser members are *in fact* interested." (*Id.* at p. 1170.) The error underlying the contention of the plaintiff in *Kimbley* was "her confusion as to the nature of her motion. She requested the trial court to establish new law in California, making the health plan membership, per se, an interest adequate to support a challenge for cause. She then expected the court to apply such a ruling to make a blanket exclusion of all prospective jurors who were members." (*Id.* at p. 1171.)

In *Kimbley*, the trial court correctly required the plaintiff to demonstrate the disqualifying interest. (*Kimbley, supra*, 164 Cal.App.3d at pp. 1170-1171.) As this court explained, "Membership in a health plan is not, per se, an interest in the outcome of a case. It is at best a remote and tenuous connection, unlike, for example, stock ownership in an insurer-defendant. (See *Traxler v. Thompson* [(1970)] 4 Cal.App.3d [278,] 281.) It is well settled that a remote or insignificant interest cannot support a challenge for cause. *Customers of a defendant utility company may not be disqualified on the basis of their business dealings with that company.* There must be some inquiry regarding the nature and extent of such a relationship. (*McKernan v. Los Angeles Gas & Electric Co*. (1911) 16 Cal.App. 280, 283.)" (*Kimbley*, at p. 1171, italics added & fn. omitted.) *Kimbley*

14

concluded that, "[w]hile actual bias need not be shown in this case, actual interest must." (*Id.* at p. 1171.)

As noted in *Kimbley*, California law has long held that prospective jurors are not categorically excluded from a jury simply by being customers of a defendant utility company. (*Kimbley, supra,* 164 Cal.App.3d at p. 1171.) In *McKernan v. Los Angeles Gas & Electric Co.* (1911) 16 Cal.App. 280, prospective jurors who were customers of the Los Angeles Gas and Electric Company were not categorically excused from serving on the jury in a personal injury action against the utility. (*Id.* at pp. 281, 283.) Thus, "mere statement" that jurors were ongoing customers of the utility did not, by itself, warrant excusal. (*Id.* at p. 283.)

## C.

### *The Burden to Demonstrate "Interest"*

The trial court did not err in ruling Amedee had the burden of demonstrating an interest under Code of Civil Procedure section 229 before the court would excuse LMUD ratepayers from the jury for implied bias. Section 229, subdivision (d), did not require blanket exclusion of all LMUD ratepayers from the jury by the mere fact they were customers of LMUD. We reject the proposition that mere status as a customer of LMUD excluded *all* ratepayers from the jury regardless of the potential impact of this case on their utility bills. "It is well settled that a remote or insignificant interest cannot support a challenge for cause." (*Kimbley*, *supra*, 164 Cal.App.3d at p. 1171.) In its briefing on appeal, Amedee notes the lack of evidence in support of the trial court's estimate that the maximum impact on LMUD ratepayers to be around five dollars per month. If anything, this lack of evidence regarding the magnitude of the interest LMUD ratepayers had in the litigation means Amedee did not meet its burden to demonstrate LMUD ratepayers had more than a remote or insignificant interest in the outcome of the case to categorically exclude them from the jury. (*Ibid.*)

15

Even assuming the trial court's estimate of financial impact on LMUD ratepayers were correct, Amedee does not attempt to show how an increase of $5 per month inherently meets the definition of a sufficient interest under Code of Civil Procedure section 229, subdivision (d). Tellingly, none of the jurors who initially expressed concern about the possible impact of this case on their utility rates was excused for actual bias. Instead, jurors A. and K. both affirmed the potential increase in their utility rates would not undermine their abilities to be fair and impartial jurors. More importantly, Amedee's argument does not offer any way to identify whether an impact on a customer will be so remote that it does not require categorical exclusion under subdivision (d) of Code of Civil Procedure section 229. Instead, Amedee's argument logically would require the exclusion of an LMUD ratepayer even if the potential impact might be less than a penny.

We reject Amedee's argument that Code of Civil Procedure section 229's exclusion from implied bias for a member or citizen or taxpayer of a municipal *water* district means ratepayers of a municipal utility district are necessarily saddled with implied bias. Municipal water districts have the prerogative of suing on behalf of all private water users living within the district "to pool their interests and represent them in protecting these rights" to have water available for use. (*Orange County Water Dist. v. City of Riverside* (1959) 173 Cal.App.2d 137, 165.) These municipal water districts do not require the permission of their individual water users before suing on their behalf. (*Id.* at p. 167.) Without the exception for municipal water districts in Code of Civil Procedure section 229, any defendant might be able to categorically exclude every juror in a county that stands to substantially benefit from the water district's successful action against unlawful appropriation of its water sources. (See, e.g., *Orange County Water Dist. v. City of Riverside,* at p. 152.) Thus, jurors with even substantial interests in gaining from a water district's action are not categorically denied for serving on a jury because of the exception provided in Code of Civil Procedure section 229. This does not,

16

however, mean jurors who are ratepayers of a municipal *utility* district are categorically excluded from serving on a jury in an action brought by or against the utility. The effect of the action may be far too speculative, remote, or insubstantial to qualify as an "interest" within the meaning of subdivision (d) of section 229. For this reason, we reiterate the holding in *Kimbley* that the moving party must demonstrate jurors have an "interest" in the action before the categorical exclusion for implied bias under Code of Civil Procedure section 229, subdivision (d), applies.

Amedee's motion was premised on the idea that mere status as an LMUD ratepayer compelled exclusion and therefore did not attempt to show the effect of the action qualified as an interest under Code of Civil Procedure section 229, subdivision (d). The trial court properly denied the motion in the absence of a showing of sufficient interest to warrant categorical exclusion of LMUD ratepayers.

## II

### *The Jury's Interpretation of the Contract*

Amedee contends this court "should reverse the jury's interpretation of section 8.2," which is a limitation of liability clause within the transmission agreement between Amedee and LMUD. In support of the argument that the jury's interpretation of section 8.2 constitutes reversible error, Amedee presents four grounds for reversal: (1) "LMUD's interpretation is at odds with Section 8.2's language," (2) a "contrary interpretation renders the key promise that LMUD made in the Transmission agreement illusory," (3) "LMUD's interpretation of Section 8.2 also violates the rule" that the contract is to be read as a whole whenever practicable, and (4) "applying Section 8.2 to cover intentional acts that are not expressly mentioned in the provision would violate the rule" that exculpatory clauses are construed against the released party. In asserting reversal based on the *jury's* interpretation of the contract, Amedee makes clear it argues only that "there are four separate and independently sufficient readings why *LMUD's*

17

*interpretation* of Section 8.2 must be rejected." (Italics added.) We reject the argument. Showing that LMUD might have misconstrued section 8.2 does not establish the jury mistakenly construed that section. Amedee cannot establish that the jury committed error by alleging the opposing party misinterpreted the contract.

Moreover, Amedee makes no attempt to show how the jury actually construed section 8.2. In support of its argument, Amedee does not offer a single record citation or even assert the jury actually relied on any of LMUD's purportedly objectionable contract interpretations. For lack of record citation, the contentions are deemed forfeited. (*Central Valley Gas Storage, LLC v. Southam* (2017) 11 Cal.App.5th 686, 695-696.)

As an alternate basis for reversal, Amedee argues this matter should be "remanded for a new court trial on the meaning of Section 8.2." In so arguing, Amedee now seeks relief for a request it did not make in a timely manner in the trial court.

In its posttrial motion, Amedee argued "that the applicability of [section] 8.2 was a legal issue for the court not the jury to decide." The trial court rejected the argument, noting: "For whatever reason, neither of these parties sought any guidance or rulings on [section] 8.2 in the liability phase, and it was admitted into evidence as part of the contract without objection. No parol evidence was offered as to the contracting parties' intentions."

Amedee failed to preserve this issue for appeal by timely raising it in the trial court. "The related doctrines of waiver and invited error prevent a party from taking advantage of an error that could have been corrected earlier if brought to the trial court's attention." (*Duran v. U.S. Bank National Assn*. (2014) 59 Cal.4th 1, 48.) Had Amedee wished the trial court to interpret section 8.2 for the jury, it could have done so by a timely request before or during trial. As the California Supreme Court has held, " '[a] party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct.' " (*People v. Thornton* (2007) 41 Cal.4th 391, 443, quoting *People v. Partida*

18

(2005) 37 Cal.4th 428, 435.)  Accordingly, we reject the request to remand this case to allow the trial court to interpret section 8.2 in the first instance.

### III

### *Section 815.2 Negligence*

Amedee argues the trial court erred in dismissing its claim for negligence under section 815.2 on summary adjudication.  We disagree.

### A.

### *Amedee's Claim*

Amedee's operative complaint alleges a cause of action against LMUD for negligence under section 815.2.  Section 815.2 provides:  "(a) A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his [or her] employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his [or her] personal representative.  [¶]  (b) Except as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability."

Amedee faults LMUD for failing "to evaluate available [short circuit current] at a utility's connection point with its large power users," and did not "conduct a system impact study before making the decision to change the voltage on the line . . . ."  In alleging negligence, Amedee's operative complaint acknowledges the line change was constituted in a decision by LMUD in furtherance of its capital improvement plan.  Specifically, Amedee asserted that "LMUD's *decision* to reduce the electric service provided to Amedee was one of several long-term plans LMUD was pursuing at the time to modify the infrastructure of its electrical grid.  . . .  The plans were developed by staff members at LMUD, including LMUD's general manager [Ray Luhring] and its electrical operations manager [Dave Folce].  . . .  During closed-door meetings, LMUD's Board of

19

Directors and its general manager *chose* which substations would be eliminated or added, and which lines would be modified."[3] (Italics added.)

LMUD moved for summary adjudication of this claim based on the immunity provided by section 820.2. The trial court granted summary adjudication of this claim, and explained: "In regards to this matter, the Court was asked to take a look at the deposition of Dave Folce, who testified that the line change arose from planning meetings with LMUD's general manager, Ray Luhring." The trial court determined: "LMUD's motion focused on immunity for liability pursuant to . . . Section 820.2, which provides that a public employee is not liable for any injury resulting from an act or omission that was the result of the exercise of discretion vested in him [or her], whether or not such discretion be abused. The Court finds that both LMUD employees Ray Luhring and Dave Folce had discretionary authority to make planning decisions for LMUD." As a result, the trial court dismissed the cause for negligence under section 815.2.

### B.

### *Immunity Under Section 820.2*

On appeal, we apply the independent standard of review to a challenge to a trial court order granting summary judgment or adjudication. (*Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 860.) A motion for summary adjudication is properly granted when it completely disposes of an entire cause of action, such as when a moving party establishes a complete affirmative defense, shows there is no merit to the claim for damages, or that the moving party did not owe a duty to the plaintiff. (Code Civ. Proc, § 437c, subd. (f)(1).) After the trial court grants summary adjudication as to fewer than all causes of action, the plaintiff's remaining claims may proceed to trial and an appeal

---

[3] Although Amedee alleges Luhring, Folce, and LMUD's board of directors made the decision about changing the line voltage to the geothermal plant, LMUD is the only defendant in this case.

from the final judgment may challenge both the issues resolved by summary adjudication and by trial. (Code Civ. Proc., § 437c, subds. (k), (n).) A statutory grant of governmental immunity defeating the claim requires the granting of summary adjudication and dismissal of the claim. (*County of Los Angeles v. Superior Court* (2009) 181 Cal.App.4th 218, 222, 231 [noting that " 'under California law, "[i]t is generally recognized that a statutory governmental immunity overrides a statute imposing liability" ' "].)

Section 820.2 provides for governmental immunity as follows: "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." This section insulates basic policy choices made by governmental officials in carrying out their duties. (*Odello Bros. v. County of Monterey* (1998) 63 Cal.App.4th 778, 793 [decision to breach a levee and flood landowner's property in order to protect other areas from high water] (*Odello Bros.*).) "[S]ection 815.2 provides in pertinent part that '(b) Except as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability.' In other words, if a public employee has discretionary immunity, the public entity employer is also immune." (*Masters v. San Bernardino County Employees Retirement Assn.* (1995) 32 Cal.App.4th 30, 39-40.)

## C.

### *LMUD's Immunity*

The trial court properly concluded LMUD was entitled to immunity against the negligence claim brought by Amedee under section 815.2. The line voltage change to the Amedee plant was a discretionary decision made by LMUD's employees and directors. Amedee's operative complaint establishes that Luhring and Folce made the decision to

21

reduce the line voltage as a result of planning meetings and in consultation with LMUD's board of directors. And Amedee's operative complaint recognizes it was a "decision to reduce the electric service provided to Amedee." The immunity provided by section 820.2 applies to the discretionary nature of LMUD's choice to reduce the power line voltage to 12.47 kilovolts. (*Odello Bros.*, *supra*, 63 Cal.App.4th at p. 793.) Even if LMUD's failure to conduct an impact study before the voltage change were negligent, this omission would be encompassed by the immunity against negligence provided by section 820.2.

We reject Amedee's contention that, even if the decision to reduce the line voltage were covered by the immunity of section 820.2, "the ministerial acts necessary to carry out that change were not." Amedee asserts these ministerial acts "included conducting a study to assess the impact of the Voltage Downgrade on Amedee's plant." In support, Amedee relies on *Johnson v. State* (1968) 69 Cal.2d 782 (*Johnson*). *Johnson* does not aid Amedee.

*Johnson* involved a claim against the State of California by a foster parent who was assaulted by a foster child with a history of violence and cruelty. (*Johnson, supra*, 69 Cal.2d at pp. 784-785.) The foster parent alleged the California Youth Authority acted negligently in placing the foster child with her but without warning of his violent propensities. (*Ibid.*) The state asserted immunity under section 820.2 based on the assertion that the placement officer exercised his discretion not to warn the foster parent. (*Johnson,* at pp. 784-785.) The California Supreme Court held the decision not to warn the foster parent was not a discretionary function under section 820.2. (*Johnson,* at pp. 787-788.) The *Johnson* court noted, " '[It] would be difficult to conceive of any official act, no matter how directly ministerial, that did not admit of some discretion in the manner of its performance, even if it involved only the driving of a nail.' " (*Id.* at p. 788, quoting *Ham v. County of Los Angeles* (1920) 46 Cal.App. 148, 162.)

22

As *Johnson* explains, " '[g]enerally speaking, a discretionary act is one which requires the exercise of judgment or choice. Discretion has also been defined as meaning equitable decision of what is just and proper under the circumstances.' " (*Johnson*, *supra*, 69 Cal.2d at p. 788, quoting *Burgdorf v. Funder* (1966) 246 Cal.App.2d 443, 449.) Rather than being subject to a bright line test, the meaning of "discretion" under section 820.2 is informed by " 'various factors [that] furnish a means of deciding whether the agency in a particular case should have immunity, such as the importance to the public of the function involved, the extent to which governmental liability might impair free exercise of the function, and the availability to individuals affected of remedies other than tort suits for damages.' " (*Johnson*, at p. 789, quoting *Lipman v. Brisbane Elementary School Dist.* (1961) 55 Cal.2d 224, 230, fn. omitted.)

Most important for purposes of this case, *Johnson* held that decisions comprising the resolution of policy decisions compel immunity. (*Johnson, supra,* 69 Cal.2d at p. 795; *Thompson v. County of Alameda* (1980) 27 Cal.3d 741, 747.) Here, the decision to change the line voltage was the quintessential exercise of discretion in furtherance of LMUD's policy-making prerogatives for its electrical network. As Amedee's own complaint acknowledges the line change decision was the product of meetings between key LMUD decision makers and represented the implementation of LMUD's capital improvement plan. The complained-of act in this case was a reasoned decision in furtherance of policy for which section 820.2 supplies immunity from claims of negligence. (*Johnson, supra,* 69 Cal.2d 782.) That LMUD's decision makers might have made the choice negligently does not remove this exercise of discretion from the purview of section 820.2. To the contrary, the very purpose of this statute is to insulate discretionary choices from claims of negligence. We reject the claim that the trial court erred in dismissing the negligence claim pursuant to section 820.2.

23

# IV

## *Inverse Condemnation*

Amedee argues the trial court's ruling "on the inverse condemnation claim must be reversed because the court improperly relied on the jury's verdict on Amedee's 'dangerous condition' claim." Amedee's argument headings assert that (1) the jury's verdict was not relevant to the inverse condemnation claim, and (2) the trial court's reliance on the jury's verdict was also erroneous because the jury included LMUD ratepayers. Based on the record, we conclude the trial court did not rely on the jury's verdict but made its own factual findings in support of its denial of the inverse condemnation claim.

## A.

### *The Trial Court's Findings on the Inverse Condemnation Claim*

At the conclusion of the bench trial on Amedee's inverse condemnation claim, the trial court issued a final ruling that contained three single-spaced pages of factual findings to support its conclusion that Amedee had not proven the line voltage change caused the destruction of its generator. The trial court's factual findings noted the parties' contentions regarding the effect of the jury's defense verdict on Amedee's inverse condemnation claim. We quote extensively from the trial court's findings to provide context for Amedee's claim.

"In our case, the jury has determined that [LMUD] is not responsible for [destruction of the generator due to line voltage change] on a negligence theory, and [Amedee] contends that this finding is irrelevant to this court's evaluation of whether liability exists in inverse condemnation. [LMUD] contends that the jury's verdict of no negligence and its finding on the verdict form that [its] high voltage line change did not result in a 'dangerous condition' is tantamount to a finding that [LMUD's] line change

24

did not cause [Amedee's] harm, a finding which should be binding on the court and dispositive of the inverse condemnation claim. [¶] . . . [¶]

"As to the question of whether or not the court is bound by the jury's findings that [LMUD's] line change did not negligently create a dangerous condition, suffice it to say that *the court intends to render its independent opinion on the matter* giving due regard to the jury's findings as best they can be determined.

"[Amedee's] strongest evidence of causation lies in the fact that its damage was more or less contemporaneous with [LMUD] power company's line voltage change. 'More' because the generator explosion occurred the very first time Amedee attempted to start its electric motors after the line change. 'Less' because there were other factors contemporaneous with the start up: 1) the start up was contemporaneous with the conclusion of an extended period of being off line, which can cause freon leaks; 2) it was coincidental with the conclusion of fairly extensive maintenance of the plant during the off line period; 3) it was coincidental with an unusual starting of both of [Amedee's] large electrical brine pump engines at the same time; 4) There had been ongoing problems at [Amedee's] plant, including insufficient freon and chronic freon leaks, lack of adequate maintenance, aging plant components including a 22 year old generator, chronic seepage of water into and around the well casings, lack of adequate investment, and there was evidence that [Amedee's] own electrical line out to its wells and pumps and pump motors was too small and created too much resistance for the job. [¶] . . . [¶]

"It should be noted here that [Amedee] has never contended that there was any inherent inadequacy of a 12.47 [kilovolt] line. The evidence showed that all of LMUD's other lines to [its] 19,00[0] customers were 12.47. Amedee's theory has been that it was damaged because the 12.47 line was inadequate and caused it damage in a unique way because of its particular circumstances and its building its plant around and depending on an existing 34.5 [kilovolt] line. But the lack of evidence of any inherent inadequacy of the new line must ultimately be confronted. The central problem with [Amedee's] case is

25

that there has been no evidence of precisely how the line voltage change caused it harm. There was no demonstration of specific damaging occurrences clearly attributable to the 12.47 line which would not happen with a 34.5 line. No showing, for instance, of just how it is that transmission from LMUD of twelve thousand volts, transformed down to 4,160 volts at the point of delivery which is the low side of LMUD's transformer, and which is the same voltage as delivered by the 34.5 [kilovolt] line to the same point, is not enough power to run the plant. The contention that the Amedee plant was designed to 'run on 34.5 [kilovolts]' is somewhat misleading. The evidence showed that after the 12.47 [kilovolt] line is stepped down to 4.16 [kilovolt] Amedee's own transformers further step the voltage down, first to 480 volts and then down to the vicinity of 120 volts, (optimal around 125 volts) which is the voltage upon which the plant actually runs. Then there are Amedee's long power cables out to its motors which were too small and had too much resistance, which would directly affect available voltage at the site of the motors. It was never demonstrated that LMUD delivered any less than 4,160 volts to Amedee. Nor was it shown that, after the restart a year after the accident, after an initially slight over-power situation solved by an adjustment to Amedee's voltage regulator that any minor undervoltage situations were not caused on Amedee's side of the electrical fence. Amedee's electrical system was far more complex than LMUD's single line and transformer." (Italics added & original underscoring.) The trial court noted that "a large challenge to [Amedee's] case was the fact that its plant, after the restart with the new generator in November of 2010, had many of its most productive years while operating under [LMUD's] new 12.47 [kilovolt] line and transformer."

## B.

### *Causation*

Amedee misreads the trial court's statements when it alleges the trial court "treated" the jury verdict "incorrectly as containing an implied finding *on causation*."

(Italics added.) Notably, Amedee does not quote the language employed by the trial court that is asserted to be erroneous. We reject Amedee's reading of the record.

The record shows the trial court found only that the jury "determined that [LMUD] is *not responsible* for said damage [to the generator] on a negligence theory." This comports with the special verdict form in which the jury answered, "no" to the question: "Did Amedee prove that it was harmed by a dangerous condition of LMUD's property?" The trial court's statement in its final ruling does not erroneously impute a finding on causation to the jury's verdict. Instead, the trial court indicated its understanding *LMUD* was arguing the jury's verdict constituted a finding on the element of causation.

Moreover, the extensive factual findings on the inverse condemnation support the trial court's undertaking "to render its independent opinion on the matter." The trial court's final ruling noted weaknesses in Amedee's evidence of causation in that the geothermal plant had been idle for an extended period before startup, had been subject to extensive maintenance during the time when LMUD effected the line change, and the startup involved turning on two large pump engines at the same time. The trial court pointedly noted the geothermal plant's lack of freon, lack of adequate maintenance, and aged mechanical components. The final ruling examined the evidence regarding electrical supply and use at the geothermal plant in detail before concluding Amedee had not shown any inherent inadequacy of the line or shown "precisely how the line voltage change caused it harm." The trial court's findings on causation are detailed and establish that the trial court undertook an independent examination of the evidence before ruling on the inverse condemnation claim. The trial court did not rely on the jury verdict to evade its duty to make its own findings on the inverse condemnation claim.

Finally, we reject Amedee's assertion that the trial court erroneously relied on the jury's verdict because the jury was composed of LMUD's ratepayers. As we explained in part I, above, the trial court did not err in refusing to categorically exclude LMUD

27

ratepayers from the jury.  Moreover, as we have also explained, the trial court did not rely on an implied finding by the jury regarding causation.

DISPOSITION

The judgment is affirmed.  Lassen Municipal Utility District shall recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


/s/
HOCH, J.


We concur:


/s/
RAYE, P. J.


/s/
ROBIE, J.